[No. S006547. Nov. 29, 1999.]

THE PEOPLE, Plaintiff and Respondent, v.
DAVID JOSEPH CARPENTER, Defendant and Appellant.

**COUNSEL**

Fern M. Laethem, State Public Defender, under appointment by the Supreme Court, Kent Barkhurst and Charles J. Press, Deputy State Public Defenders, for Defendant and Appellant.

Daniel E. Lungren and Bill Lockyer, Attorneys General, George Williamson, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, William M. Wood, Laura Whitcomb Halgren and Steven T. Oetting, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**CHIN, J.**—Two juries have convicted defendant of being the "Trailside Killer" who, in 1980 and 1981, assaulted hikers on remote paths in Santa

Cruz and Marin Counties, raped some, shot seven to death, and wounded an eighth. Both juries returned a verdict of death, and the courts imposed judgment accordingly.

The case we now review, tried in San Diego County following a change of venue, is the appeal from the second judgment of death. The jury found defendant guilty of these crimes in Marin County: the first degree murders of Cynthia Moreland, Richard Stowers, Anne Alderson, Diane O'Connell, and Shauna May, the rapes of Alderson and May, and the attempted rape of O'Connell. It found true special circumstance allegations of multiple murder and, as to Alderson, May, and O'Connell, rape murder. It also found that defendant personally used a firearm as to each crime. After a penalty trial, the jury returned a verdict of death, and the superior court imposed that sentence. Later, the same court granted defendant's petition for writ of habeas corpus and vacated the judgment. We reversed that decision, thereby reinstating the death judgment. (*In re Carpenter* (1995) 9 Cal.4th 634 [38 Cal.Rptr.2d 665, 889 P.2d 985] (*Carpenter I*).) This appeal is automatic.

Previously, we affirmed defendant's first judgment of death, rendered in Los Angeles for his Santa Cruz County crimes. (*People* v. *Carpenter* (1997) 15 Cal.4th 312 [63 Cal.Rptr.2d 1, 935 P.2d 708] (*Carpenter II*).) We now affirm the second.

## I. FACTS

### A. *Guilt Phase*

#### 1. *Prosecution Evidence*

On October 11, 1980, Cynthia Moreland and Richard Stowers were fatally shot in the head near a hiking trail in a heavily wooded area of Point Reyes National Seashore. Hikers heard gunshots in the area sometime around 1:00 to 2:00 p.m. that day. Moreland's and Stowers's bodies were discovered on November 29, 1980, lying facedown near each other.

Two days after the first shooting, on Columbus Day, October 13, 1980, Anne Alderson was fatally shot in the head from close range near a hiking trail on Mount Tamalpais. A caretaker of a nearby inn last saw her alive around 5:30 that evening. Her body was discovered two days later. It was clothed, but the vagina contained sperm, indicating she had had sexual intercourse around the time she died.

On November 28, 1980, Diane O'Connell and Shauna May were fatally shot in the head at Point Reyes National Seashore. Hikers heard shots in the

area around 3:10 p.m. that day, followed by more shots about 10 minutes later. The next day, O'Connell's and May's nude bodies were discovered lying facedown side by side about 200 yards from the bodies of Moreland and Stowers. A pair of panties was in O'Connell's "mouth and nose area," and a bloodstained second pair was by her arm. Physical evidence indicated O'Connell had also been strangled, probably while still alive, by something like a narrow piece of cord or wire. No sperm was found on her body. May's vagina and rectum contained sperm, indicating she had had sexual intercourse around the time she died. A vague ligature mark was found on May's left wrist.

The prosecution presented evidence of the March 29, 1981, murder of Ellen Hansen and attempted murder of Steven Haertle in the Santa Cruz Mountains. These crimes were the subject of defendant's earlier trial. In essence, a gunman confronted Haertle and Hansen on a hiking trail, said he wanted to rape Hansen, and then shot both, killing Hansen. (*Carpenter II, supra*, 15 Cal.4th at pp. 345-346.)[1] The prosecution linked defendant to the crimes of this case primarily by showing that defendant shot Hansen and Haertle, and that the same person committed both the Santa Cruz and the Marin County crimes. It presented much of the same evidence of identity as at the first trial. (*Carpenter II, supra*, 15 Cal.4th at pp. 347-349.) We summarize that evidence.

Ballistics evidence established that a single gun, a .38-caliber Rossi revolver, was used in each of the killings. Documentary evidence showed that Mollie Purnell, defendant's friend, purchased that gun shortly before the first killing. Purnell testified she bought the gun for defendant and gave it to him at his request. Shane and Karen Williams, both bank robbers, testified that defendant gave them the gun on May 13, 1981, shortly before his arrest. Shane hid the gun in a vacant lot after defendant's arrest and later told the police where he hid it. The police found and seized the gun. Other witnesses also connected defendant to a similar-appearing gun. The Haertle/Hansen gunman was clean-shaven. Around the time of that shooting, defendant, who had been clean-shaven, started to grow a beard. Haertle and another witness identified defendant as the gunman at a physical lineup and at trial. Other witnesses could not identify anyone at the physical lineup (at which defendant was bearded) but did identify him in court. One witness identified a different person at a physical lineup but identified defendant in court. Two witnesses connected the gunman to a red Fiat similar to one defendant owned. Several witnesses said the gunman wore a gold jacket containing

---

[1] At the guilt phase, the trial court excluded as unduly prejudicial evidence of the rape and murder of Heather Scaggs, the other Santa Cruz County crimes. (*Carpenter I, supra*, 9 Cal.4th at p. 641.)

distinctive lettering like a jacket that defendant's girlfriend had brought from a bar in Montana and that defendant sometimes wore. Evidence showed that the day before the Haertle/Hansen shooting, defendant purchased a pair of Nike shoes with a size and pattern identical to shoeprints the gunman left behind. The jacket and the shoes were never found. Around early April 1981, defendant told his girlfriend the jacket had been stolen from his car. After defendant's arrest, a bag containing an unexpended .38-caliber bullet was found in another of his cars. A semen stain on Alderson's panties was of a type consistent with about 15 to 19 percent of the Caucasian population, including defendant.

### 2. *Defense Evidence*

At the first trial, defendant did not contest his identity as the gunman. (*Carpenter II, supra,* 15 Cal.4th at p. 349 & fn. 2.) At the second trial he did.

An expert testified that a Nike shoe of defendant's size that the police purchased for comparison purposes could not have left the shoeprints at the Haertle/Hansen crime scene because the shoeprints had 28 ridges in one region, while the comparison shoe had 29 ridges. Defendant presented evidence questioning the ability of one witness to observe the gunman and his car, and impeaching the testimony of another who connected him to the murder weapon. Defendant presented an expert who claimed the serological analysis of the semen stain on Alderson's panties was unreliable. He presented evidence suggesting that the gunman wore a jacket different from the one from the bar in Montana, and that the .38-caliber bullet in the bag did not actually come from his car. He also presented several witnesses challenging Mollie Purnell's credibility.

Several witnesses testified about seeing a man who could have been the Haertle/Hansen gunman. One witness testified that on the day of the shooting, she saw the man a few miles from the crime scene pumping gas into a car quite different from a red Fiat. Another witness testified that she saw the man the morning before the shooting; he did not look like defendant. Another witness testified she saw a man wearing a jacket like the gunman's shortly before 5:00 p.m. on March 19, 1981, near the scene of the shooting; he did not look like defendant. Two witnesses testified that they saw the man near the crime scene the day before the shooting. They described the man somewhat inconsistently with defendant's appearance. One said the man appeared unshaven, with one or two days' growth of beard on his face. In court, however, one of these witnesses said defendant looked similar to the man; the other positively identified him as the man.

One of defendant's employers testified that he was working with her at her business called Gems of the Golden West in San Francisco on October 13,

1980—the day Alderson was killed—until after 4:30 p.m., possibly until 5:30 to 6:00 p.m.

Defendant testified on his own behalf, denying any involvement in these crimes. He said he knew Mollie Purnell but denied ever receiving the Rossi revolver from her. He admitted wearing the jacket his girlfriend had brought from Montana but denied telling her it had been stolen. He believed "she lost it one night when she got drunk." He admitted purchasing the pair of Nike · shoes the day before the Haertle/Hansen shooting. He also described in detail his activities during the relevant times. He said he saved receipts and other documents that could establish what he had been doing in case his parole officer ever asked.

Defendant testified that on October 11, 1980—the day Moreland and Stowers were killed—he took his father shopping, then took his mother to a foot clinic. He produced some documents they received from the clinic that day. They left the foot clinic around 11:00 to 11:30 a.m. and did additional shopping, arriving home around 5:45 p.m. On October 13, 1980, he worked at Gems of the Golden West until 5:30 to 6:00 p.m., then went home. On the day May and O'Connell died, the day after Thanksgiving 1980, defendant was at his parent's house fixing a broken toilet. Defendant said he started growing his beard on March 24, 1981. He spent much of the day of the Haertle/Hansen shooting in Redwood City with four men, whose real names he could not remember, discussing defendant's idea for a business involving adult key chains. He went home that day around 3:00 p.m.

Bank records showed that defendant's father's credit card was used for a purchase at one of the places where he said he was shopping on October 11, 1980. The proprietor of the business estimated that the purchase might have occurred around 1:30 to 2:30 p.m.

### 3. *Rebuttal and Surrebuttal*

The prosecution presented evidence that the number of ridges on Nike shoes of the type involved in this case varies slightly, even on shoes of the same size. Accordingly, although the shoes the police purchased for comparison purposes in this case could not have made the shoeprints found at the Haertle/Hansen crime scene, another pair of shoes of the same make and size might have.

An examiner of questioned documents testified that someone intentionally altered the date on two of the documents that defendant produced to show that he had been at the foot clinic the day Moreland and Stowers was killed,

to read October 11, 1980. On both documents, the second numeral of the day of the month was changed. One of the changes was from "0" to "1"; the other was from an unknown numeral to "1."

On surrebuttal, a podiatrist with the foot clinic testified that the clinic was usually open on Saturday mornings, but not on Fridays. October 10, 1980, was a Friday. However, by the end of 1980, the clinic did see patients on weekdays.

### B. *Penalty Phase*

#### 1. *Prosecution Evidence*

The prosecution presented much of the same evidence about defendant's numerous earlier crimes and convictions as it did in the previous trial. (*Carpenter II, supra*, 15 Cal.4th at pp. 349-350.) As to one of the incidents, the prosecution proved only the convictions; it did not present evidence of the crimes themselves. It also presented evidence of an altercation on December 23, 1980, in which defendant pulled out a gun and threatened to kill the other person.

The prosecution also presented evidence of the rape and murder of Heather Scaggs, the other crimes that were the subject of the first trial. (*Carpenter II, supra*, 15 Cal.4th at pp. 346-347.) Scaggs, defendant's co-worker, was last seen alive on May 2, 1981, the morning she was scheduled to go to Santa Cruz with defendant. Hikers found her, dead of a gunshot wound to the head, on May 24, 1981, in a mountainous area of Santa Cruz County. Physical evidence indicated the victim had had sexual intercourse near the time of death. The same .38-caliber Rossi gun used in the other crimes was used in this one.

#### 2. *Defense Evidence*

As it did at the first trial, the defense presented considerable evidence in mitigation. (See *Carpenter II, supra*, 15 Cal.4th at p. 350.) It presented evidence defendant had an unhappy and abused childhood, he stuttered, he was a good employee, he behaved well in prison, and he was a loving father to his three children. Several experts testified on his behalf. Dr. Ernest Bryant, a neuropsychologist, opined that defendant has a "mixed personality disorder with borderline narcissistic, and antisocial features." Dr. Craig Haney, another psychologist, testified that defendant's early institutionalization in juvenile facilities worsened his preexisting psychological problems, that various institutions diagnosed but failed adequately to treat his psychological problems, and that defendant became dependent on institutional structure and procedure for adequate psychological adjustment.

### 3. *Rebuttal*

The prosecution presented testimony from defendant's first wife, one of his parole officers, a state rehabilitation counselor, and two experts who disagreed with some of the defense experts' opinions.

## II. DISCUSSION

### A. *Jury Selection Issues*

#### 1. *Failure to Provide the Jurors Adequate Compensation*

█ Before trial, defendant challenged the jury selection process on certain grounds and requested an evidentiary hearing. Later, he withdrew the bulk of the challenge, reserving only his "objection to the granting of hardship excuses for jurors based upon their inability to survive on a five dollar a day . . . stipend for probably six months of jury service in this capital case." He argued that hardship excuses would inevitably "deny him a representative cross-section of the community." The court stated it would grant an evidentiary hearing on the question if defendant wanted one, but defendant did not want one. Instead, defendant relied solely "on a common sense and legal objection to hardships," arguing that the $5 per day stipend would inevitably "discriminate against racial groups." Absent a supporting evidentiary showing, the court denied defendant's challenge. It also denied his request to "state for the record the race, ethnic background, age, and sex of all persons excused for financial hardship in this case," observing that what is relevant is the "entire jury pool," not the jurors selected for this trial.

Defendant argues that the "failure to provide adequate compensation to the jurors resulted in at least 124 prospective jurors being excused based on financial hardship and deprived [him] of his right to due process and to a fair and impartial jury drawn from a representative cross-section of the community under the state and federal constitutions." Our response to similar arguments in *Carpenter II* applies here. " 'In order to establish underrepresentation, and thus denial of an impartial jury drawn from a fair cross-section of the community, a defendant must make a prima facie showing: "(1) that the group alleged to be excluded is a 'distinctive' group in the community; (2) that the representation of this group in the venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury selection process." [Citation.]' [Citations.] [¶] As might be expected, many prospective jurors were excused for hardship . . . . We have already held that persons excused

for hardship or persons of low income do not constitute a cognizable class, and that the court need not pay jurors more than the statutory amount. [Citations.] To the extent defendant argues to the contrary, the argument thus fails." (*Carpenter II, supra,* 15 Cal.4th at pp. 351-352.)

Defendant argues that the "effect of offering such a small amount as a jury fee was to exclude the poor, as well as African-Americans and Hispanics." In *Carpenter II,* we were skeptical that any correlation between hardship excusals and cognizable classes such as race and sex "would lead to a prima facie showing of a 'systematic exclusion' . . . ." (*Carpenter II, supra,* 15 Cal.4th at p. 352.) Defendant, however, has not even made that showing. He declined the court's offer of an evidentiary hearing. The court was correct that any correlation of this nature among the jurors actually called for this case would prove nothing that is legally significant. The relevant bodies are the " ' "venires from which juries are selected," ' " not the specific group of jurors called in any given case. (*Ibid.*) Defendant has established no basis for relief.

### 2. Excusing Certain Prospective Jurors Because of Their Views on the Death Penalty

██ Defendant contends the court erroneously excused for cause three jurors because of their views on the death penalty. ██ "A prospective juror may be excused for cause if that juror's views on the death penalty 'would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." ' [Citations.] . . . On review, if the juror's statements are equivocal or conflicting, the trial court's determination of the juror's state of mind is binding. If there is no inconsistency, we will uphold the court's ruling if it is supported by substantial evidence. [Citations.]" (*Carpenter II, supra,* 15 Cal.4th at p. 357.) A juror's bias need not "be proven with unmistakable clarity. [Citations.] Rather, it is sufficient that the trial judge is left with the definite impression that a prospective juror would be unable to faithfully and impartially apply the law in the case before the juror." (*People* v. *Rodrigues* (1994) 8 Cal.4th 1060, 1146-1147 [36 Cal.Rptr.2d 235, 885 P.2d 1].) Under this standard, we uphold the court's rulings in this case.

██ The first juror was an attorney who wrote on a questionnaire that he once toured San Quentin and saw the gas chamber, which he found "revolting." He wrote, "this would affect my decision-making in the second half of a bifurcated first degree murder trial." At voir dire the parties and court questioned him at length on his views. The court then excused him in a lengthy oral ruling. Among other things, the court noted that the prospective

juror said he believed a life sentence is "tougher" than the death penalty, which "is absolutely contrary to the California scheme of punishment"; that the court was not sure whether "he actually believes that or not . . . because I believe that his attitude in response to the questions . . . was extremely combative"; and that often, "rather than answer the questions directly, there was a deflection and an attempt for him to state what his views are." The court "really got the impression that the man was using this forum as some sort of a soap box for his own personal views about the death penalty." Accordingly, the court found the prospective juror "substantially impaired . . . in making the choice of penalties." The record supports the court's ruling. The prospective juror gave lengthy, often nonresponsive, and sometimes inconsistent answers. Under the circumstances, an appellate court must defer to the findings of the trial judge, who was actually present and could observe the juror.

The second juror was equivocal in her answers. Several times she said she did not "know" whether she could vote for the death penalty. Other times she stated she could follow the law and indicated she could return either verdict. The third juror expressed the view that life without parole was the harsher of the two penalties. He also said he was "predisposed" towards life in prison, although he could vote for the death penalty. At times, the juror said he did not "know" if his views would impair his ability to consider the case; other times he indicated he could return either verdict. After questioning the juror twice, the court dismissed him. It noted that "in viewing the demeanor of the juror, I found him to be acting under significant stress . . . . And it seems to me that he really has some deep-seated views with respect to capital penalty and certainly the two penalties involved." It found the juror "would be substantially impaired in performing his duties." Again, under these circumstances, we must defer to the trial court's rulings.

Defendant argues the trial court erred in considering the jurors' views that life without parole is the harsher punishment. These views, however, are part of the entire picture the court may consider. (*People* v. *Millwee* (1998) 18 Cal.4th 96, 147 [74 Cal.Rptr.2d 418, 954 P.2d 990].)

### 3. *Excusing Certain Prospective Jurors for Cause*

■ Defendant contends the court erroneously excused two other jurors for cause. " 'In general, the qualification[s] of jurors challenged for cause are "matters within the wide discretion of the trial court, seldom disturbed on appeal." ' " (*People* v. *Holt* (1997) 15 Cal.4th 619, 655-656 [63 Cal.Rptr.2d 782, 937 P.2d 213].)

The first juror indicated doubts that he could fairly judge the credibility of a witness who admitted to using drugs. The court and parties questioned him

at length on two separate occasions. At times his answers seemed to be contradictory, which was one reason the court recalled him for additional questioning. Ultimately, however, the juror said that because of his past experiences, he did not know if he would react logically to evidence of drug usage. The court excused him, finding "that his state of mind is such that if narcotics evidence is entered into the case, that that very well could prevent him from acting with entire impartiality and to the prejudice of the substantial rights of both parties . . . ." The second juror described two negative experiences he had with the San Diego police and expressed concerns about how he would react to evidence of drug usage. After close questioning, the court excused the juror, finding the juror's views on the police "troublesome" and also finding he "would be extremely biased against any witness called who has either used narcotics or, particularly, sold narcotics . . . ."

We cannot say either ruling was an abuse of discretion. The question was close as to both jurors. Both gave some answers indicating they could be fair jurors, others indicating they might not. The judge, who was present and could observe them, could judge their credentials far better than an appellate court reading a cold record. Moreover, any error was harmless. " '[T]he general rule [is] that an erroneous exclusion of a juror for cause provides no basis for overturning a judgment.' . . . Defendant has a right to jurors who are qualified and competent, not to any particular juror." (*People* v. *Holt*, *supra*, 15 Cal.4th at p. 656.) The actual jurors of this case were qualified and competent.

In arguing that any error was reversible, defendant cites *People* v. *Hamilton* (1963) 60 Cal.2d 105, 128 [32 Cal.Rptr. 4, 383 P.2d 412]. That case does not aid defendant. There, during the penalty trial, a *sitting* juror was erroneously excused in favor of an alternate after that juror had made statements indicating she favored the defense side. We found the error prejudicial. "[I]f the record shows (as it does here), that, *based on the evidence*, that juror was inclined toward one side, the error in removing such a juror would be prejudicial to that side." (*Ibid.*, italics added.) Removing during trial a selected juror who favored one side based on the evidence is far different from excusing one or two of many prospective jurors before the jury was selected and any evidence was presented. The rule of *Holt* applies here, not *Hamilton*. (*People* v. *Holt*, *supra*, 15 Cal.4th at p. 656.)

### 4. *Denying a Defense Challenge for Cause as to One Juror*

■ Defendant contends the court erroneously denied his challenge for cause to one prospective juror who eventually sat on the jury. Our review of the record discloses no error, but even if we assume error, it would not be

reversible. Defendant accepted the jury without exhausting his peremptory challenges. Defendant may not complain on appeal that the court failed to excuse the juror when he could have done so himself. (*People* v. *Bolin* (1998) 18 Cal.4th 297, 314-316 [75 Cal.Rptr.2d 412, 956 P.2d 374].)

### B. *Pretrial Issues*

#### 1. *Alleged Impermissible Multiple Prosecutions*

 In *Carpenter II*, defendant argued that the two Santa Cruz County murders should have been tried separately. (*Carpenter II*, *supra*, 15 Cal.4th at pp. 361-362.) Now he argues that all of the Marin County and Santa Cruz County crimes should have been tried together. He claims that trying him separately for the crimes committed in each county violated Penal Code section 654 and "his rights to due process, and to a reliable penalty determination." Just as we disagreed that the Santa Cruz County crimes had to be tried piecemeal, so, too, do we disagree that all the crimes in both counties had to be tried together.

As pertinent, Penal Code section 654 provides that when an "act or omission . . . is punishable in different ways by different provisions of law," an "acquittal or conviction and sentence under any one bars a prosecution for the same act or omission under any other."[2] Defendant argues that this provision bars prosecution of the Marin County crimes after he was convicted of the Santa Cruz County crimes. He relies principally on *Kellett* v. *Superior Court* (1966) 63 Cal.2d 822 [48 Cal.Rptr. 366, 409 P.2d 206]. In *Kellett*, the defendant was standing on a public sidewalk with a pistol in his hand. He was charged with and pleaded guilty to a misdemeanor charge of exhibiting a firearm in a threatening manner. We held that this conviction prohibited a later prosecution for the felony of possessing a concealable weapon by a felon arising out of the same facts. *Kellett* bears no similarity to this case. Whatever the scope of that decision, the murder of separate victims on separate days in separate counties is not a single act or even a "course of conduct" (*id.* at p. 827) requiring a single prosecution. (See generally, *People* v. *Cuevas* (1996) 51 Cal.App.4th 620 [59 Cal.Rptr.2d 146].)

Penal Code section 790 generally places venue for a murder charge in the county (1) where the fatal injury was inflicted, (2) where the victim died, or (3) where the body was found. Santa Cruz County was the site of all three for the murders charged in that county, Marin County the site of all three for the murders charged in that county. Defendant waived his right to be tried in

---

[2]We quote the current version of Penal Code section 654. It was substantially identical at the time of the crimes and trials.

those counties when he successfully moved to change venue. But no authority permitted, and none compels, murders committed in different counties to be tried together. (See *People* v. *Bradford* (1976) 17 Cal.3d 8, 13-17 [130 Cal.Rptr. 129, 549 P.2d 1225] [When criminal behavior began in one county and ended in another after a police chase, the crimes committed in each county were properly tried separately in that county.].)[3]

Because evidence of some of the crimes of the other county was presented in each trial, defendant contends the successive prosecution violated due process. It did not. (*Ciucci* v. *Illinois* (1958) 356 U.S. 571 [78 S.Ct. 839, 2 L.Ed.2d 983]; *People* v. *McLain* (1988) 46 Cal.3d 97, 121, fn. 6 [249 Cal.Rptr. 630, 757 P.2d 569].) We also disagree that trying both sets of crimes separately resulted in an unreliable penalty determination.[4]

### 2. *Evidence Allegedly Obtained in Violation of Defendant's Miranda Rights*

 Defendant moved to suppress evidence he claimed was obtained in violation of his rights under *Miranda* v. *Arizona* (1966) 384 U.S. 436 [86 S.Ct. 1602, 16 L.Ed.2d 694, 10 A.L.R.3d 974]. On May 13, 1981, defendant's parents told the police that Dr. Stamper was the family optometrist. Sergeant Brook went to the doctor's office the same day and was told that defendant's mother was a patient but not defendant. Sergeant Brook testified at the suppression hearing that he was dissatisfied with the information he had received from the office and had decided to return to investigate further. He questioned defendant after his arrest on May 15, 1981, and asked further questions after defendant invoked his right to counsel. Defendant told him that he had ordered some glasses from Dr. Stamper. The next day, another officer went to the doctor's office and interviewed various employees, including Jacqueline Purcell.

The prosecution did not present evidence of defendant's statement, but Purcell testified at the guilt phase that on May 2, 1981, defendant came to the doctor's office to have his glasses repaired and to order a new pair of glasses with the model name "Hillside." She sometimes saw him wearing a

---

[3]In 1998, long after defendant's trials, Penal Code section 790 was amended to permit murders committed in different counties to be tried together in certain circumstances. (Pen. Code, § 790, subd. (b); Stats. 1998, ch. 549, § 1.)

[4]Defendant does not specifically argue the separate prosecutions violated the prohibition against double jeopardy. That argument would also lack merit. " '[T]he murder of two persons, even by the same act, constitutes two offenses, for each of which a separate prosecution will lie, and . . . a conviction or acquittal in one case does not bar a prosecution in the other.' " (*People* v. *McLain, supra,* 46 Cal.3d at pp. 120-121, quoting *People* v. *Majors* (1884) 65 Cal. 138, 146-147 [3 P. 597].)

baseball cap. The court refused to suppress that evidence, finding that the police inevitably would have discovered Purcell as a potential witness. In a detailed oral ruling, the court specifically "accept[ed] and credit[ed]" Sergeant Brook's testimony. It found that Sergeant Brook was still very interested in Dr. Stamper's office, and had he "not received the direct information from [defendant] on May 15th, that he . . . or some other investigator would have gone back to Dr. Stamper's office . . . ." In addition to Sergeant Brook's testimony, the court noted the sheer size and scope of the investigation into the serial killer case in determining that the police would inevitably have discovered Purcell's information.

The parties agree that Sergeant Brook obtained defendant's statement in violation of the *Miranda* rules. Accordingly, the statement itself was inadmissible; it was not admitted. Defendant argues that the court also had to suppress Purcell's testimony as the fruit of the poisonous tree. (See generally, *Wong Sun* v. *United States* (1963) 371 U.S. 471 [83 S.Ct. 407, 9 L.Ed.2d 441].) The Attorney General responds that the fruit of the poisonous tree doctrine does not apply to a noncoerced statement taken in violation of the *Miranda* rules. (Compare *Oregon* v. *Elstad* (1985) 470 U.S. 298 [105 S.Ct. 1285, 84 L.Ed.2d 222] and *Michigan* v. *Tucker* (1974) 417 U.S. 433 [94 S.Ct. 2357, 41 L.Ed.2d 182], with *People* v. *Schader* (1969) 71 Cal.2d 761, 778-779 [80 Cal.Rptr. 1, 457 P.2d 841].) We need not resolve the question because we uphold the trial court's application of the inevitable discovery rule.

 Evidence need not be suppressed if the prosecution can establish by a preponderance of the evidence that the information would inevitably have been discovered by lawful means. (*Nix* v. *Williams* (1984) 467 U.S. 431, 444 [104 S.Ct. 2501, 2509, 81 L.Ed.2d 377]; *People* v. *Boyer* (1989) 48 Cal.3d 247, 277-279 & fn. 18 [256 Cal.Rptr. 96, 768 P.2d 610]; *Green* v. *Superior Court* (1985) 40 Cal.3d 126, 136-137 [219 Cal.Rptr. 186, 707 P.2d 248] (lead opn. of Kaus, J.); *People* v. *Gesner* (1988) 202 Cal.App.3d 581, 591-592 [248 Cal.Rptr. 324].) As this is essentially a question of fact, we must uphold the trial court's determination if supported by substantial evidence. (See *People* v. *Boyer, supra*, 48 Cal.3d at p. 263; *People* v. *North* (1981) 29 Cal.3d 509, 513 [174 Cal.Rptr. 511, 629 P.2d 19].) Deferential review is particularly necessary when, as here, the factual determination depends in part on judging a witness's credibility. Here, substantial evidence supports the court's finding. Sergeant Brook, whose testimony the court specifically credited, testified he had intended to return to the office to investigate further. Urging his own view of the evidence, defendant argues the police might not have discovered the information absent the *Miranda* violation, but we have no basis on which to overturn the court's determination.

Defendant also argues that the inevitable discovery rule should not apply because of the "flagrancy" of the unlawful conduct. We implicitly disagreed in *People* v. *Boyer, supra,* 48 Cal.3d at pages 277-279. Although Sergeant Brook clearly violated the prophylactic *Miranda* rules, the record does not suggest that defendant's statement was coerced or otherwise involuntary. In those circumstances, federal law (and California law today) allows even the statement itself to be used for impeachment. (*People* v. *Peevy* (1998) 17 Cal.4th 1184, 1192-1193 [73 Cal.Rptr.2d 865, 953 P.2d 1212].) When, as here, the evidence would have been discovered lawfully even absent the *Miranda* violation, "the deterrence rationale [of the exclusionary rule] has so little basis that the evidence should be received. Anything less would reject logic, experience, and common sense." (*Nix* v. *Williams, supra,* 467 U.S. at p. 444 [104 S.Ct. at p. 2509], fn. omitted.)

Moreover, any error would have been harmless, whether measured by the reasonable doubt standard applicable to federal constitutional error (*Chapman* v. *California* (1967) 386 U.S. 18, 24 [87 S.Ct. 824, 828, 17 L.Ed.2d 705, 24 A.L.R.3d 1065]) or the reasonable probability standard applicable to errors of state law (*People* v. *Watson* (1956) 46 Cal.2d 818, 836-837 [299 P.2d 243]). The issue of guilt was not remotely close. The trial court correctly described the evidence of defendant's guilt as "overwhelming." (*Carpenter I, supra,* 9 Cal.4th at p. 645.) The evidence of identity was so strong that defendant did not contest it at the first trial. Defendant's friend, Mollie Purnell, purchased the gun used to commit all the crimes. Purnell and other witnesses connected him to that weapon. It is unreasonable to suppose that Purnell, Shane Williams, who told the police where to find the murder weapon, and Karen Williams, Shane's wife and partner in crime, all chose to commit perjury to help convict an innocent person of capital crimes. In addition, "[r]egarding the Hansen/Haertle crimes, there were multiple eye-witness identifications, evidence regarding the distinctive jacket both the gunman and defendant wore, shoeprint evidence, and evidence that defendant owned a car similar to the gunman's." (*Carpenter II, supra,* 15 Cal.4th at p. 362.)

At the second trial, defendant did attempt to establish a doubt as to his identity as the gunman but did little to diminish the force of the prosecution evidence. Defendant presented virtually no alibi evidence other than his own testimony. An employer testified that he was at work with her until as late as 5:30 to 6:00 p.m. the day Alderson was killed. Even if one believes the witness could remember that particular day with such precision, the testimony proved little. The victim was seen alive around 5:30 p.m. that day, and her body was not discovered until two days later. Defendant presented documentary evidence that he claimed supported his testimony regarding

some of his activities the day Moreland and Stowers were killed, but even crediting those documents, they did not prevent him from being the killer on that date. Moreover, an expert testified that someone intentionally altered the date on two of the documents.

Defendant also presented the testimony of some witnesses who saw a person who might have been the gunman but presumably was not defendant. The evidence may have shown a few false leads, or that some witnesses noticed the gunman's jacket but did not particularly note his face at a time when there was no reason to. It did little else. Moreover, two of these witnesses testified that defendant *did* look like the person they saw. Defendant presented evidence showing that a particular shoe similar (not identical) to one he purchased could not have made the gunman's footprints, but other evidence established that the shoes he purchased could have made the footprints; they were of the same size and pattern.

Defendant testified, denying the crimes and describing in great detail his activities during the relevant times, but his testimony was far from convincing. He admitted wearing the distinctive jacket and purchasing the shoes similar in size and pattern to those of the gunman. He also admitted knowing Purnell and others who connected him to the murder weapon. Testifying after he reviewed telephone records, he admitted he had numerous telephone conversations with Purnell during the relevant times, including four the day before she purchased the eventual murder weapon, one the day after she purchased it, and others around the time she received it. He denied that these conversations related to her purchasing the gun for him and claimed she was lying. He also denied his other acquaintances' testimony that connected him to the murder weapon. He admitted owning a red Fiat like the gunman's, which he said he purchased on March 25, 1981. He also admitted that when he talked to the police a few days before his arrest, in response to their questions about his vehicles, he told them about one of his cars but not the Fiat. He claimed he understood the police to be interested only in the cars to which he had access on May 2, 1981, and he did not have access to the Fiat on that date because it was "in the shop." Defendant testified he was at work all day the day Alderson was killed. On direct examination, he referred to some records that he said showed he had typed a response to a certain business letter from Hong Kong that day. On cross-examination, the prosecution confronted him with his employer's records showing that the letter from Hong Kong was itself dated the day Alderson was killed. Defendant then acknowledged that he could not have written the response when he said he did.

In light of the trial as a whole, Purcell's testimony was insignificant. Any error in allowing her to testify was harmless.

### 3. Search and Seizure Issues

At trial, defendant moved to suppress various items of evidence. He contends the court erred in denying the motion. As a threshold matter, the Attorney General argues that because defendant made a similar motion to suppress evidence in the first prosecution (see *Carpenter II, supra*, 15 Cal.4th at pp. 362-366), he is collaterally estopped from relitigating the searches' legality. (See generally, *Lucido* v. *Superior Court* (1990) 51 Cal.3d 335, 341 [272 Cal.Rptr. 767, 795 P.2d 1223, 2 A.L.R.5th 995]; *People* v. *Sims* (1982) 32 Cal.3d 468, 484 [186 Cal.Rptr. 77, 651 P.2d 321].) The Attorney General makes a similar argument as to other issues that are common to both prosecutions. We need not decide whether and to what extent collateral estoppel applies here, for none of the contentions have merit. In considering the issues, we bear in mind that because "these crimes were committed before the 1982 adoption of Proposition 8, its provisions do not apply." (*Carpenter II, supra*, 15 Cal.4th at p. 362.)

As in the earlier appeal, defendant challenges a search warrant for the search of his home, person, and cars. He makes one argument not made in the first appeal. He argues the warrant was overbroad because it did not "particularly describ[e] the . . . things to be seized." (Cal. Const., art. I, § 13.) He does not clearly specify what evidence admitted at trial was seized under a provision that he claims was overbroad, but he appears to challenge the admission of maps and "Sierra Club materials . . . including books, hiking schedules, and maps of Mt. Tamalpais." The warrant authorized the seizure of "National or State Park brochures, maps, receipts, or literature; and road maps." The authorization was appropriate. The police had probable cause to believe defendant was a serial killer of victims along isolated hiking trails. Under the circumstances, the range of potential relevant evidence was quite broad. "[I]n a complex case resting upon the piecing together of 'many bits of evidence,' the warrant properly may be more generalized than would be the case in a more simplified case resting upon more direct evidence." (*People* v. *Bradford* (1997) 15 Cal.4th 1229, 1291 [65 Cal.Rptr.2d 145, 939 P.2d 259], quoting *Andresen* v. *Maryland* (1976) 427 U.S. 463, 481, fn. 10 [96 S.Ct. 2737, 2748-2749, 49 L.Ed.2d 627].) Items showing familiarity with the crime scenes were clearly relevant to connect defendant to these crimes.

The remaining portions of the warrant that defendant challenges as over-broad also seem reasonably directed to the seizure of relevant evidence. But we need not decide the question definitively. Defendant has not identified any item seized under any of these other provisions that was admitted at trial. Accordingly, even if we assume some provision of the warrant was overbroad, defendant has not shown that any evidence should have been

suppressed. (*People* v. *Camarella* (1991) 54 Cal.3d 592, 607, fn. 7 [286 Cal.Rptr. 780, 818 P.2d 63]; *Aday* v. *Superior Court* (1961) 55 Cal.2d 789, 797 [13 Cal.Rptr. 415, 362 P.2d 47].)

Defendant also argues the affidavits supporting the warrant contained material misstatements and omitted material facts, and the search of his home exceeded the warrant's scope. On the latter point, defendant challenges only one item of evidence actually admitted at trial, a pair of athletic shoes. Our discussion rejecting similar arguments in *Carpenter II, supra,* 15 Cal.4th at pages 362-364, also applies to these contentions.

Defendant challenges the seizure and subsequent search of his Chevrolet station wagon. We rejected most of the arguments in *Carpenter II, supra,* 15 Cal.4th at pages 364-365. Defendant makes new arguments that some of the information supporting probable cause was stale, and that the affidavits supporting the warrant omitted more material information than he argued before. Having considered the new arguments, we continue to find there was probable cause to search the vehicle and that the supporting affidavits were not substantially misleading. Defendant also challenges the seizure of the bullet from that car. We previously rejected a similar argument. (*Carpenter II, supra,* 15 Cal.4th at p. 365.) To the extent defendant's current contention differs from his previous one, we find nothing warranting a different outcome.

Finally, defendant argues the police unlawfully obtained his federal prison and parole records. His federal probation officer allowed the police to review the records when they were investigating these crimes. Later the police obtained copies of some of the records from federal authorities. Defendant argues these events violated the federal Freedom of Information and Privacy Acts. (5 U.S.C. §§ 552, 552a.) Assuming that the acts cover these records (see *United States* v. *Miller* (10th Cir. 1981) 643 F.2d 713, 715), the Privacy Act allows disclosure "for a routine use . . . ." (5 U.S.C. § 552a(b)(3).) The probation officer testified that he provided the information to the police under agency rules stating that approved routine uses include " 'providing assistance to federal, state, local or foreign enforcement officers investigating a violation of law.' " Defendant does not challenge the accuracy of this testimony. "Consequently, no violation of the Privacy Act occurred." (*United States* v. *Miller, supra,* 643 F.2d at p. 715; see also *Little* v. *F.B.I.* (D.Md. 1992) 793 F.Supp. 652, 655, affd. (4th Cir. 1993) 1 F.3d 255.) Because defendant has shown no violation of the acts, we need not decide whether a violation would require the suppression of evidence.

### 4. *Denial of Motion to Suppress Identification Evidence*

After defendant's arrest, several witnesses viewed him in a six-man physical lineup. Defendant contends the lineup was impermissibly suggestive. We rejected a similar argument regarding the same lineup in *Carpenter II*, *supra*, 15 Cal.4th at pages 366-368. As we held in that case, nothing in the lineup caused defendant to " 'stand out' from the others in a way that would suggest the witness should select him." (*Id.* at p. 367.) "[A]s a whole, the lineup was not 'unduly suggestive.' " (*Ibid.*)

Although two defense attorneys attended the lineup, defendant also contends his right to their assistance was violated because they were not allowed to be present at interviews with the witnesses just before and after the lineup. He relies solely on *People* v. *Williams* (1971) 3 Cal.3d 853 [92 Cal.Rptr. 6, 478 P.2d 942]. In *Williams*, defense counsel was present for the lineup, but after viewing it, the witness "was taken outside the viewing room for the purpose of making his identification. Appellant's attorney asked permission to accompany [the witness] and listen to any identification made by him" but was not permitted to do so. (*Id.* at p. 855.) Under these facts, we found a violation of the defendant's right to an attorney. Defendant argues a similar violation occurred in this case. We rejected a similar argument in *Carpenter II*, *supra*, 15 Cal.4th at pages 368-369, and distinguished *Williams* partly on the basis that here the actual identifications occurred in the presence of defense counsel. Defendant now makes the new factual argument that two of the witnesses, one who identified him at the lineup and one who selected someone else, made the actual identifications after the lineup in defense counsel's absence.

In response, the Attorney General argues first that, because the lineup was held before formal judicial proceedings had begun, defendant was not entitled to counsel at all. (*Kirby* v. *Illinois* (1972) 406 U.S. 682 [92 S.Ct. 1877, 32 L.Ed.2d 411]; *United States* v. *Gouveia* (1984) 467 U.S. 180, 187-188 [104 S.Ct. 2292, 2296-2298, 81 L.Ed.2d 146].) He notes that the holding of *People* v. *Bustamante* (1981) 30 Cal.3d 88 [177 Cal.Rptr. 576, 634 P.2d 927], which established a contrary rule under state law, applied prospectively only (*id.* at p. 102), and that the lineup of this case occurred months before that decision. It appears that at the time of the lineup, formal charges had been filed for the Santa Cruz County crimes but not the crimes charged in this case. We need not decide whether defendant's right to counsel applied only to the Santa Cruz County crimes because there was no violation of the right as to any of the crimes.

The evidence was conflicting whether the two witnesses made their identifications during the lineup or afterwards. The witnesses themselves

testified they received and marked identification cards after the lineup. However, the detective who escorted the witnesses individually to and from the lineup testified that the witness who identified defendant did so in the lineup room. The victim, Haertle, testified he marked his identification form in the lineup room, suggesting that the detective's pattern was to have the witnesses fill out the card in the lineup room. The trial court could reasonably have credited the detective's testimony, concluding that the two witnesses, who testified long after the lineup, merely forgot they had received the lineup card during the lineup. The court did not expressly resolve this factual question, but "[a]n order is presumed correct; all intendments are indulged in to support it on matters as to which the record is silent, and error must be affirmatively shown." (*Corenevsky* v. *Superior Court* (1984) 36 Cal.3d 307, 321 [204 Cal.Rptr. 165, 682 P.2d 360].) We must "view the record in the light most favorable to the trial court's ruling and defer to its findings of historical fact, whether express or implied, if they are supported by substantial evidence." (*People* v. *Miranda* (1993) 17 Cal.App.4th 917, 922 [21 Cal.Rptr.2d 785].) The record shows the trial court was aware of the decision of *People* v. *Williams, supra,* 3 Cal.3d 853. Because substantial evidence supports an implied finding that the witnesses made their identifications in the lineup room, defendant has not demonstrated error.

Moreover, we see no basis to exclude any evidence even if either or both of the two witnesses had actually marked the lineup card in counsel's absence. The *Williams* court expressly limited its holding to its facts and "express[ed] no opinion on any case which may arise in a different factual setting." (*People* v. *Williams, supra,* 3 Cal.3d at p. 857.) In this case, the interviews were tape-recorded, which "minimized the concerns that led to the adoption of the *Williams* rule." (*Carpenter II, supra,* 15 Cal.4th at p. 369.) Unlike *Williams,* counsel here could listen to the recording of the interview, and thus be "fully apprised" of what occurred. (*People* v. *Williams, supra,* 3 Cal.3d at p. 856.) *Williams* was narrowly decided. As Justice Mosk's strong dissent, joined by two others, noted, defense counsel must not be allowed to interfere with a police investigation. (*Id.* at p. 860 (dis. opn. of Mosk, J.).) The Attorney General urges us to overrule *Williams.* We need not do so on these facts, but we decline to extend its holding to a case like this where the subsequent interview was recorded.

### C. *Guilt Phase Issues*

#### 1. *Evidentiary Rulings as to One Witness*

A witness testified on direct examination that one weekend in September or October 1980, when she was 14 years old, she went to Mollie Purnell's

home in Modesto with her boyfriend. Defendant showed her and the boyfriend a "big handgun" and talked about "burglaries and thieving and things like that." She understood defendant "to be a professional thief, that's what he said, and a burglar and things like that." The next day she went with defendant to San Francisco. On the way, they stopped at a park. Defendant showed her what he called his "thief kit," a suitcase containing another gun, woven wire like the kind used to hang pictures, and strips of nylon or cloth. Referring to the nylon or cloth, defendant said, "This is what I use to gag people with." Referring to the wire, he said, "This is what I use to tie them up with." The witness testified that the gun she saw at the park was smaller than the one she saw earlier that weekend. The second gun looked like the gun used in the killings. The first time she told anyone about seeing two different guns was two days before her testimony at this 1988 trial.

A pretrial hearing was held regarding the admissibility of much of this testimony. Defendant contends the court erred in admitting the testimony about seeing the two guns. As he did at the pretrial hearing, defendant cites *People* v. *Riser* (1956) 47 Cal.2d 566, 577 [305 P.2d 1], which held inadmissible evidence that the defendant possessed weapons other than the murder weapon. The trial court here allowed evidence that the witness saw defendant with a gun that could be linked to the murder weapon; at the same time, aware of the *Riser* case, the court also indicated doubt about admitting evidence of a gun that could not have been the murder weapon. This ruling was correct and fully consistent with *Riser*. The witness said the gun defendant showed her at the park looked like the murder weapon. Accordingly, the testimony was admissible. (*People* v. *Neely* (1993) 6 Cal.4th 877, 896 [26 Cal.Rptr.2d 189, 864 P.2d 460].)

Defendant also contends the court should not have admitted evidence about the first, larger gun defendant showed the witness. He argues that because this gun could not have been the murder weapon, *Riser* requires its exclusion. (*People* v. *Riser, supra,* 47 Cal.2d at p. 577.) However, defendant did not object to testimony about this larger gun. The witness did not mention seeing *two* guns until two days before her trial testimony, long after the pretrial hearing. In light of the court's earlier expressed doubt about admitting evidence of a gun that could not be linked to the murder weapon, it may well have excluded evidence of a different gun had defendant objected at trial. Defendant's objection at the pretrial hearing to any testimony about gun possession was not sufficient to preserve an objection to the actual testimony about two *different* guns. (*People* v. *Morris* (1991) 53 Cal.3d 152, 190 [279 Cal.Rptr. 720, 807 P.2d 949].)

The record strongly suggests the defense did not object to this new testimony for a tactical reason. Once the court admitted evidence of the gun

similar to the murder weapon, the witness's recollection of two different guns may have helped the defense by casting doubt on her credibility. This part of her testimony was inconsistent with the boyfriend's testimony. Indeed, at a hearing to discuss the permissible scope of cross-examination, the court stated the belief that "it was a mistake for the prosecution to bring up the second gun. . . . [M]aybe they felt they had to. I think it certainly hurts this girl's credibility." The district attorney explained he had just learned about the second gun shortly before her testimony, that he had told the defense about it, and that "if it's going to come out, it might as well come out." In his argument to the jury, defense counsel used this belated recollection of two guns to challenge her credibility. Defendant cannot fail to object to the evidence and use it in jury argument, then argue for the first time on appeal that it should not have been admitted.

Defendant contends the court erred in admitting the witness's testimony about seeing the wire in defendant's possession. At the pretrial hearing, the court delayed a ruling on the admissibility of this evidence pending foundational evidence that the wire could have been used in committing the O'Connell and May murders. During trial, the doctor who performed the autopsy testified outside the presence of the jury that a wire like the one the witness described could have made the marks found on O'Connell's and May's bodies. After hearing this testimony, the court admitted the wire evidence. The ruling was correct. Evidence that defendant possessed an object that might have inflicted the marks on O'Connell and May around the time they were murdered tended to show his identity as the killer. Because, as defendant notes, the description of the wire was "generic," and the pathologist could not state with certainty that a wire inflicted the marks, the inference "may have been weak, but that does not make the evidence irrelevant. The fact that many persons may similarly have possessed such [objects] may diminish the strength of the evidence, but it does not make it irrelevant." (*People* v. *Freeman* (1994) 8 Cal.4th 450, 491 [34 Cal.Rptr.2d 558, 882 P.2d 249, 31 A.L.R.5th 888].) Defendant also argues the evidence should have been excluded as unduly prejudicial under Evidence Code section 352. However, evidence of wire possession is not inherently prejudicial. (*People* v. *Freeman, supra,* 8 Cal.4th at p. 492.) The court acted within its discretion in admitting the evidence.

 Defendant also contends the court erred in admitting his statements that he was a "professional thief" and describing his use of the nylon or cloth and the wire. At the pretrial hearing, the court ruled the witness could testify that defendant said he was a "thief," but disallowed use of the word "professional" as unduly prejudicial. It also offered to give a limiting instruction on how the jury could consider that evidence. It allowed the

testimony that defendant said he used the nylon or cloth to gag people and the wire to tie them up. Defendant first argues the evidence was inadmissible hearsay. He did not object on that basis at trial so may not raise the issue now. (*People* v. *Green* (1980) 27 Cal.3d 1, 22 & fn. 8 [164 Cal.Rptr. 1, 609 P.2d 468].) Moreover, a hearsay objection would have lacked merit. Evidence Code section 1220 provides that "Evidence of a statement is not made inadmissible by the hearsay rule when offered against the declarant in an action to which he is a party . . . ." The evidence was of statements, defendant was the declarant, the statements were offered against him, and he was a party to the action. Accordingly, the hearsay rule does not make the statements inadmissible. Defendant argues that the statements were not "admissions." The argument is irrelevant to the hearsay question. Evidence Code section 1220 refers to a "statement," not an "admission." It is true that the section heading refers to "Admission of party," but the heading is irrelevant to its construction. (Evid. Code, § 5.) The hearsay rule does not compel exclusion of *any* statement offered against a party declarant, whether or not it can be described as an admission.

Concluding that defendant's statement was not excludable under the hearsay rule does not, of course, necessarily mean it was admissible. Defendant did object to the statements under Evidence Code section 1101, which generally prohibits evidence that merely proves the defendant had the propensity or disposition to commit the crime charged. (See *People* v. *Guerrero* (1976) 16 Cal.3d 719, 724 [129 Cal.Rptr. 166, 548 P.2d 366].) The court properly admitted the statement about defendant's being a "thief," offered not to prove its truth, but to indicate the circumstances in which defendant showed the witness the gun and suitcase. These circumstances were relevant to her credibility, which was a material issue. (*People* v. *Hawkins* (1995) 10 Cal.4th 920, 951 [42 Cal.Rptr.2d 636, 897 P.2d 574].) The court acted within its discretion in concluding the prosecution was not limited to eliciting that defendant showed her the items but could also demonstrate why. His bragging about being a thief helped explain why he showed her the items and why she would remember the events. To limit the witness to stating that defendant showed her the items without mentioning what he said would artificially make her account less believable. In light of the physical evidence indicating the killer gagged O'Connell and bound or strangled her and May with wire, defendant's statements that he used the nylon or cloth to gag his victims and the wire to tie them was also directly relevant to show he committed the crimes in this case. Defendant points out that there is no evidence the victims were robbed. This circumstance did not compel exclusion of the statements. The jury could reasonably find defendant was bragging about his use of the gun and other objects in committing the crimes in this case but was prudently understating matters.

Defendant also argues the court should have excluded the evidence as unduly prejudicial. At the pretrial hearing, the court did exclude the word "professional."[5] When the witness actually testified several months later, she used that word. Defendant did not object at that time. If he had, the court would no doubt have stricken it. Under the circumstances, defendant has waived the right to object to that specific word. (*People* v. *Morris, supra*, 53 Cal.3d at p. 190.) In the context of this case, none of the statements were particularly prejudicial. Defendant was charged with being a serial killer, not a thief. The trial court could reasonably find it highly unlikely the jury would convict defendant of being a serial killer despite a reasonable doubt on that score because it heard evidence that he described himself as a thief, professional or otherwise. It did not abuse its discretion. (*Carpenter II, supra*, 15 Cal.4th at p. 380.)[6]

 Finally, defendant argues the court improperly limited his cross-examination of the witness in two respects. First, defendant sought to cross-examine her about her probationary status in a juvenile matter at the time she first spoke with law enforcement about this case. The court ruled that defense counsel could not ask her whether she was on probation but could ask her whether she had a juvenile case, and could "develop with her whether she thought in any aspect of that juvenile case she was going to get any benefit in this case or anybody made any promises to her about any aspects of the juvenile case." Second, defendant sought to question her about the facts underlying her juvenile adjudication, in which she allegedly used a gun. The court ruled that the defense could ask the witness about her familiarity with guns, but it did not allow the defense to go into the details of the juvenile case. On cross-examination, the witness denied knowing much about guns. The defense again sought to go into the details of the facts underlying the juvenile matter. The court ruled that her testimony did not "open up the door." It found the underlying facts were not "probative with respect to . . . what has been offered by the prosecution," and that "it just would be cumulative and totally a waste of time for [the defense] to probe into . . . the underlying circumstances of her juvenile case." We find no error.

 " '[A] criminal defendant states a violation of the Confrontation Clause by showing that he was prohibited from engaging in otherwise

---

[5] In addition, the prosecution did not offer, and the court indicated it would not have admitted, evidence indicating that defendant made a sexual advance towards the witness when he showed her the gun at the park.

[6] It is not clear whether defendant also contends the court erred in not giving a limiting instruction, as it offered to do. If he does, the contention lacks merit. He did not request a limiting instruction; the court has no sua sponte duty to give one. (*People* v. *Collie* (1981) 30 Cal.3d 43, 63-64 [177 Cal.Rptr. 458, 634 P.2d 534, 23 A.L.R.4th 776].)

appropriate cross-examination designed to show a prototypical form of bias on the part of the witness, and thereby, "to expose to the jury the facts from which jurors . . . could appropriately draw inferences relating to the reliability of the witness." ' (*Delaware* v. *Van Arsdall* (1986) 475 U.S. 673, 680 [106 S.Ct. 1431, 1436, 89 L.Ed.2d 674] (*Van Arsdall*), quoting *Davis* v. *Alaska* (1974) 415 U.S. 308, 318 [94 S.Ct. 1105, 1111, 39 L.Ed.2d 347].) However, not every restriction on a defendant's desired method of cross-examination is a constitutional violation. Within the confines of the confrontation clause, the trial court retains wide latitude in restricting cross-examination that is repetitive, prejudicial, confusing of the issues, or of marginal relevance. (*Van Arsdall, supra,* 475 U.S. at pp. 678-679 [106 S.Ct. at p. 1435] . . . .) California law is in accord. (See *People* v. *Belmontes* (1988) 45 Cal.3d 744, 780 [248 Cal.Rptr. 126, 755 P.2d 310].) Thus, unless the defendant can show that the prohibited cross-examination would have produced 'a significantly different impression of [the witnesses'] credibility' (*Van Arsdall, supra,* 475 U.S. at p. 680 [106 S.Ct. at p. 1436]), the trial court's exercise of its discretion in this regard does not violate the Sixth Amendment." (*People* v. *Frye* (1998) 18 Cal.4th 894, 946 [77 Cal.Rptr.2d 25, 959 P.2d 183].)

 As he did at trial, defendant relies heavily on *Davis* v. *Alaska* (1974) 415 U.S. 308 [94 S.Ct. 1105, 39 L.Ed.2d 347]. In *Davis,* a "crucial witness for the prosecution" was on juvenile probation both at the time of the events about which he testified and at trial. (*Id.* at pp. 310-311 [94 S.Ct. at pp. 1107-1108].) Because of state rules requiring confidentiality of juvenile adjudications, the trial court refused to allow any cross-examination about the witness's juvenile court history. The court found the blanket prohibition violated the defendant's right to confront witnesses. However, that decision does not require courts to permit any cross-examination the defense may wish regarding juvenile proceedings. (See *Delaware* v. *Van Arsdall* (1986) 475 U.S. 673, 678-679 [106 S.Ct. 1431, 1434-1435, 89 L.Ed.2d 674].) Here, the trial court considered the state of the evidence and *Davis* v. *Alaska, supra,* 415 U.S. 308. It permitted the defense to inquire into whether the witness had a juvenile case and whether she received any promises or expected any benefits regarding that matter. It did not preclude the defense from presenting evidence she *did* receive any promises or benefits; the defense did not claim it had any such evidence. Moreover, the defense did not claim, and the record does not indicate, that the witness was on probation when she testified several years later. The record does not establish the prohibited cross-examination would have produced "a significantly different impression of [the witness's] credibility . . . ." (*Delaware* v. *Van Arsdall, supra,* 475 U.S. at p. 680 [106 S.Ct. at p. 1436].) Accordingly, we find no abuse of discretion.

We also find the court did not abuse its discretion in not permitting the defense to probe into the facts underlying the juvenile adjudication. Defendant argues that because the facts allegedly involved the witness's use of a gun, the evidence showed she was familiar with guns, contrary to her trial testimony. Her familiarity with guns was of marginal relevance. Defendant argues this familiarity shows she could have fabricated her testimony about seeing the two guns. Her testimony, however, was not particularly technical; she would not have needed great knowledge about guns to invent it. Courts may "prevent criminal trials from degenerating into nitpicking wars of attrition over collateral credibility issues." (*People v. Wheeler* (1992) 4 Cal.4th 284, 296 [14 Cal.Rptr.2d 418, 841 P.2d 938]; see also *People v. Lavergne* (1971) 4 Cal.3d 735, 744 [94 Cal.Rptr. 405, 484 P.2d 77] ["A party may not cross-examine a witness upon collateral matters for the purpose of eliciting something to be contradicted."].)

Moreover, rather than being "crucial" (*Davis v. Alaska, supra,* 415 U.S. at p. 310 [94 S.Ct. at p. 1107]), this witness was minor in the context of the entire case. Even assuming the court permitted the prosecution to elicit too much information, and the defense too little, we would find the error harmless under any standard.

### 2. *Other Evidentiary Rulings*

Defendant contends the court made several other erroneous evidentiary rulings. One witness testified that in February 1981, defendant said he carried a gun in his van. The witness never saw the gun. Another witness testified that in February or March 1981, defendant showed her a gun that "looks like" the murder weapon. The court ruled both items of evidence admissible over objection. We find no error. Although the witnesses did not establish the gun necessarily was the murder weapon, it might have been. Unlike *People v. Riser, supra,* 47 Cal.2d at page 577, this evidence did not merely show that defendant was a person who possesses guns, but showed he possessed a gun that might have been the murder weapon after the first and before the last of the killings. The evidence was thus relevant and admissible as circumstantial evidence that he committed the charged offenses. (*People v. Neely, supra,* 6 Cal.4th at p. 896.)

Another witness testified over objection that around late April or early May 1981, defendant told her "there is just really nothing like the power of a gun to achieve the ends you want"; "it was really the ultimate challenge to get away with murder"; and rape "is really an ultimate achievement, to do something like that." The court excluded any statements about "robberies." Defendant contends the evidence was inadmissible character evidence under

Evidence Code section 1101 and should have been excluded as unduly prejudicial under Evidence Code section 352. The Attorney General argues, first, that the claims are not cognizable on appeal because defendant failed to object on those grounds at trial. We disagree. Defendant specifically invoked Evidence Code section 352 at trial. Although he did not specifically cite Evidence Code section 1101 in objecting to these statements (he did in making similar objections to other items of evidence), he did object on the ground that the statements merely showed he was a "criminal" and a "bad person." Under the circumstances, the specific nature of the objection was sufficiently clear to preserve the issue.

The contention, however, lacks merit. Evidence that defendant talked about using guns and committing murder and rape soon after the rapes and murders in this case, all involving use of a gun, was circumstantial evidence that he committed the charged crimes. Unlike *People* v. *Guerrero, supra*, 16 Cal.3d 719, which defendant cites, where the prosecution presented evidence the defendant committed an uncharged crime, the prosecution here did not suggest these statements showed defendant committed crimes other than those of this case; rather, these statements were admitted to show he committed *these* crimes. Defendant argues the statements were merely "part of a philosophical conversation about crime." If so, they were of little relevance. But, from the evidence as a whole, the jury could reasonably find they were a very general reference to the charged crimes, which made them relevant to whether he committed them.

Defendant also contends the record fails to show the court considered the prejudicial effect of the evidence. However, a court need not expressly state for the record it engages in a weighing process every time it makes a ruling. (*People* v. *Crittenden* (1994) 9 Cal.4th 83, 135 [36 Cal.Rptr.2d 474, 885 P.2d 887].) The record as a whole shows the court was well aware of, and consistently performed, its duty under Evidence Code section 352 to balance the probative value of evidence against any prejudicial effect.

A defense witness testified on direct examination that he was defendant's employer at a trade school in Hayward. They "became friends." The witness also operated another business called "Moon Tide" at the same location. He testified that time sheets indicated defendant was at work until 2:15 p.m. the day another defense witness said she saw a man who might have been the gunman near the scene of the Hansen/Haertle shooting. On cross-examination, the witness said defendant was also involved in the Moon Tide business. Over objection, the witness testified defendant invested about $2,000 into the business. The prosecution was allowed to introduce into evidence a letter dated November 16, 1980, that defendant wrote to the witness demanding repayment of this money by November 30, 1980. The letter threatened

after that date to "turn[] on the vigorish clock," i.e., to charge the amount of interest "used in the loan sharking business," which would make the witness owe about $10,000 by December 1. The amount owed would "increase rapidly" after that. The letter said, "either pay me now or pay me a lot more later," and concluded, "Your old pal, now your ex-old pal."

Defendant contends the letter was irrelevant and inadmissible "character" evidence. The court admitted the letter as relevant to the witness's "credibility with respect to bias and prejudice" and also relevant in light of defense cross-examination of Mollie Purnell. Previously, the defense had elicited from Purnell that defendant told her he wanted the gun to "move money" for the "Mafia." We see no error in light of the defense evidence. As the court found, evidence that the witness and defendant were not merely friends and employer-employee was relevant to the witness's credibility and to the reliability of the employment records used to establish the partial alibi. "Evidence showing a witness's bias or prejudice or ·which goes to his credibility, veracity or motive may be elicited during cross-examination." (*People* v. *Howard* (1988) 44 Cal.3d 375, 428 [243 Cal.Rptr. 842, 749 P.2d 279].) Moreover, the evidence was relevant to corroborate the testimony the defense elicited from Purnell in an apparent attempt to discredit her testimony. Defendant argues the letter should have been excluded as too prejudicial. We disagree. The letter was relatively innocuous. As the court noted, the reference to the "loan sharking business" was not much different from the "Mafia" reference the defense itself elicited from Purnell. The court acted within its discretion in admitting the letter.

### 3. *Photographs*

 The prosecution sought to admit a number of photographs of the murder victims. The court excluded some as unduly prejudicial but admitted others over defense objection, including three of victims O'Connell and May. The court admitted one to show the mark on O'Connell's neck, which was relevant to whether the wire that one witness said defendant showed her could have inflicted it. The court admitted two to support the pathologist's testimony regarding the manner of death and sequence of shots. Defendant contends the court erred in admitting the photographs and violated his federal constitutional rights. "Because defendant objected only on statutory grounds, the constitutional arguments are not cognizable on appeal." (*Carpenter II, supra,* 15 Cal.4th at p. 385.) Moreover, "The court did not abuse its broad discretion in admitting the photographs." (*Ibid.*) They were relevant for the purposes identified. The court carefully exercised its discretion in excluding photographs it found unduly gruesome and admitting others it found less gruesome.

Before the prosecution rebuttal argument to the jury, defendant objected to the prosecutor's displaying photographs of the victims while alive. The court ruled that the prosecutor could not "use the photographs to try to inflame the passions of the jury," but it allowed him to use them to argue that the victims looked alike. After this portion of the prosecution argument, defense counsel noted for the record that the prosecutor displayed the photographs in a row before the jury for about 25 minutes. The court found nothing improper. It noted the photographs were not placed "where the jury would be looking. [The prosecutor] has been standing in front of the jury, and the photographs are off to the side. And I didn't see any jurors paying particular attention to the photographs after they were discussed."

Defendant contends that the prosecutor committed misconduct by displaying the photographs before the jury for such a lengthy period. He argues that the prosecutor's argument regarding the similarities of the victims was brief, and the prosecutor therefore used the photographs not only to illustrate the similarities but also to appeal to the passions and sympathy of the jurors just before they began to deliberate. Although displaying potentially inflammatory photographs for an unnecessarily lengthy period might be improper in some circumstances, we find no misconduct here. As the trial court's rulings and observations demonstrate, it guarded against improper use of the photographs while permitting their proper use. The prosecutor's conduct neither rendered defendant's trial fundamentally unfair nor constituted a deceptive or reprehensible method to attempt to persuade the jury. Accordingly, we reject defendant's claim of misconduct. (See *People* v. *Smithey* (1999) 20 Cal.4th 936, 959-960 [86 Cal.Rptr.2d 243, 978 P.2d 1171].)

### 4. *Impeachment With Prior Convictions*

Defendant had numerous prior felony convictions. Over defense objection, the prosecution sought to impeach him, should he testify, with four of the convictions, three for robbery and one for vehicle theft. At a pretrial hearing, the court permitted impeachment with only two of the convictions, described as "felonies involving theft." The court found the convictions not too remote, even though defendant had suffered them 17 years before trial, "because of the defendant's long period of incarceration." Defendant had been incarcerated all but two of the years between the convictions and trial. Defendant contends the court erred.

The Attorney General argues first that the issue is not cognizable on appeal because defendant did not renew his pretrial objection at trial, and he elicited the convictions himself on direct examination. We disagree. The pretrial objection and hearing were adequate to preserve the issue under the

standards of *People* v. *Morris, supra,* 53 Cal.3d at page 190. Moreover, the defense elicited the convictions only after the court ruled the prosecution could do so. Defendant obviously believed it was better for the jury to hear of the convictions from him first rather than from the prosecution later. He did not have to take this step at the cost of losing his right to appeal the ruling that caused it. (*People* v. *Turner* (1990) 50 Cal.3d 668, 704-705, fn. 18 [268 Cal.Rptr. 706, 789 P.2d 887].)

However, the court did not err. As the parties and court recognized at trial, "Because defendant's crimes occurred prior to the adoption of Proposition 8 in June 1982, . . . the governing law was *People* v. *Beagle* (1972) 6 Cal.3d 441 [99 Cal.Rptr. 313, 492 P.2d 1], not *People* v. *Castro* (1985) 38 Cal.3d 301 [211 Cal.Rptr. 719, 696 P.2d 111]." (*People* v. *Turner* (1994) 8 Cal.4th 137, 199-200 [32 Cal.Rptr.2d 762, 878 P.2d 521].) But even at the time of the crimes, "No witness including a defendant who elects to testify in his own behalf [was] entitled to a false aura of veracity." (*People* v. *Beagle* (1972) 6 Cal.3d 441, 453 [99 Cal.Rptr. 313, 492 P.2d 1].) The two convictions clearly bore on veracity, neither was similar to the charged offenses, and, as sanitized, they were not similar to the behavior with which defendant was charged. Defendant testified despite the court's ruling. All these factors supported admitting the priors. (*Ibid.*) Defendant relies solely on their remoteness. Citing *People* v. *Antick* (1975) 15 Cal.3d 79 [123 Cal.Rptr. 475, 539 P.2d 43], which found convictions suffered 17 and 19 years before trial too remote, defendant contends the court was required to exclude *all* of the convictions. However, as the trial court noted, defendant had been incarcerated most of the intervening time, which reduces the strength of the claim that he led a " ' "legally blameless life." ' " (*People* v. *Turner, supra,* 8 Cal.4th at p. 200, quoting *People* v. *Beagle, supra,* 6 Cal.3d at p. 453.) Moreover, the fact that defendant suffered felony convictions in 1960, then again in 1970, also diminishes the remoteness factor. The court did not abuse its discretion in permitting impeachment with a small part of defendant's felony convictions.

### 5. *Alleged Prosecutorial Misconduct*

 In a contention related to one raised in *Carpenter II, supra,* 15 Cal.4th at pages 410-412, defendant contends the prosecutor committed misconduct in presenting and arguing evidence indicating the gunman had returned to the crime scene a few days after shooting Hansen and Haertle and urinated on the spot where Hansen's head had lain.

In the prosecution case-in-chief, an investigating officer testified that he was called back to the crime scene on April 4, 1981, arriving around 1:30

p.m. He observed new shoeprints. "The length, the width, and the class characteristics were the same" as the shoeprints the gunman left behind. Although the prints were similar, the witness could not state for sure that the same shoes made both sets of prints. It also appeared someone had urinated on the spot where Hansen's head had lain. As noted in the factual summary, the defense later presented expert testimony that, because of a discrepancy in the number of ridges, a sample pair of shoes could not have left the original set of footprints. The prosecution countered with expert testimony that another pair of shoes of the same make and size might have. The defense also presented evidence from defendant's employer that defendant was with her all day on April 4, 1981, beginning at 8:00 a.m.

Defense counsel argued to the jury that the gunman returned to the scene on April 4, 1981, and defendant could not have been the gunman because he had an alibi for that day. The prosecutor responded that as he listened to the testimony and argument about the shoes, he "decided to go back to [April 4] because the defense indicated that he was with [defendant's employer]. [¶] And we've all counted ridges and heard about counting ridges on March 29th, and it dawned on me that we've never counted ridges for April 4th, not one expert. You can count them for yourselves, but I went back and looked at [a photograph of the April 4, 1981, shoeprints]; I counted the ridges, and I counted 31. [¶] You go in and take a look at those exhibits, and you can count for yourselves. So what significance that evidence has now, I don't know, but I counted 31 ridges on those footprints."

Defendant argues the prosecutor committed misconduct by arguing facts not in evidence and failing to make a timely disclosure of false testimony and exculpatory evidence. The claims are not cognizable on appeal because defendant failed to object at trial. (*Carpenter II, supra,* 15 Cal.4th at pp. 396, 411.) Moreover, the contentions lack merit. We have already rejected similar claims of false evidence and failure to disclose. (*Id.* at p. 411.) The investigating officer testified only that the shoeprints were similar, as indeed they were; he claimed nothing more. There was also full disclosure. "The prosecution knew nothing the defense did not know." (*Ibid.*)

The prosecutor's argument to the jury was proper comment on the evidence. (*People* v. *Thomas* (1992) 2 Cal.4th 489, 526 [7 Cal.Rptr.2d 199, 828 P.2d 101].) Contrary to defendant's claim, he did not testify but merely argued the evidence. The relevant exhibits were in evidence. As the prosecutor told the jurors, they could count the ridges for themselves. Defendant contends the argument was improper in light of what we said in *Carpenter II*: "We have examined the exhibits. At first glance the shoeprints appear to be identical. Upon closer inspection, however, there does seem to be a slight

discrepancy in the number of ridges. Whether this is because different shoes made the prints or because of the nature and quality of the prints is beyond this court's expertise. Neither side presented evidence on the question." (*Carpenter II, supra,* 15 Cal.4th at p. 411.) Defendant argues that if "assessing the number of ridges" is beyond this court's expertise, it is also beyond the prosecutor's expertise. However, the prosecutor did no more than what we did, or what anyone could do; he noted the discrepancy in the number of ridges. He did not claim to know the significance of the discrepancy. Moreover, in this case, both parties *did* present expert testimony.

The precise significance of the evidence may be debated. For example, in *Carpenter II,* defendant argued on appeal the discrepancy meant the gunman did *not* return to the crime scene. In this trial, he argued the gunman *did* return to the scene and, because defendant claimed an alibi for the time of the gunman's return, he could not have been that gunman. One possible inference is that defendant did return but simply wore another pair of shoes of the same size and make. Even if one credits the employer's alibi testimony, defendant might have returned to the crime scene before 8:00 a.m., a time when fewer people would be around. The jury heard all the evidence and could judge the matter for itself. In any event, this entire question was trivial in light of the overall evidence of guilt.

### 6. *Failure to Give Unanimity Instruction*

As to the murders of Alderson, O'Connell, and May, the court instructed the jury on felony murder as a theory of first degree murder. It also instructed that if the jury unanimously agreed defendant was guilty of first degree murder, it was not required to agree on a theory. Defendant argues the instruction was erroneous. We have repeatedly rejected the argument. (*Carpenter II, supra,* 15 Cal.4th at pp. 394-395, and cases cited.) Any error was also harmless. As to the murders of Moreland and Stowers, the court instructed only on premeditation as a theory of first degree murder. The jury convicted defendant of the first degree murder of those victims, thus finding premeditation. It is hard to imagine how the jury could find defendant premeditated those killings and not the others. Moreover, as to the other three victims, the jury also found defendant guilty of rape or attempted rape and found true the rape-murder special circumstance. The jury thus unanimously agreed with a first degree felony-murder theory. (*Carpenter II, supra,* 15 Cal.4th at p. 395.)

### D. Penalty Phase Issues

#### 1. Refusal to Order a Separate Penalty Jury

■ Defendant asked the court to impanel a new jury for the penalty determination. The court denied the motion. Defendant contends the court erred. We disagree.

Reflecting the Legislature's long preference for a single jury to determine both guilt and penalty (*People* v. *Bradford, supra,* 15 Cal.4th at p. 1353), Penal Code section 190.4, subdivision (c), requires the guilt jury to decide the penalty unless the court discharges that jury "for good cause shown." Defendant argues good cause existed here. The trial court expressed the view that it was "almost automatic" that the jury, which had found defendant guilty of the charged crimes, would find he also killed Heather Scaggs once the prosecution proved the same person committed that crime. Defendant argues this observation shows that the jury would be unable to perform its duty properly. It did not. The comment reflected the state of the evidence, not jury bias.[7] The jury's guilt verdict was based on the evidence. If the jury also found defendant killed Scaggs, which was, indeed, almost certain given the evidence, that finding would also be based on the evidence, not bias. The trial court does not "abuse its discretion in declining to impanel a new jury based upon the assertion that the jury at the penalty phase might be prejudiced by having heard the evidence of the capital crimes." (*People* v. *Bradford, supra,* 15 Cal.4th at p. 1354.) Defendant had the opportunity to try to raise a reasonable doubt that he killed Scaggs. That he was unlikely to succeed before this jury, or any other that heard the evidence, provided no cause to impanel a new jury and effectively retry the entire case. The court acted within its discretion in following the preferred procedure. (*Id.* at p. 1353.)

#### 2. Reliance on the Hansen/Haertle Crimes as Aggravating Evidence

■ At the guilt phase, the prosecution presented evidence of the Hansen/Haertle crimes to prove defendant's guilt of the charged offenses. The court instructed the jury it was only to consider the evidence as it bore on guilt and not to prove defendant had a "bad character or . . . a disposition to commit crimes." At the penalty phase, the prosecution did not again

---

[7]The evidence of Scaggs's murder, first presented at the penalty phase, provided yet additional compelling evidence of defendant's guilt. It would be utterly unreasonable to suppose that some hypothetical real killer (who looked like defendant, wore a distinctive jacket like defendant's, wore shoes of the same size and pattern as a pair defendant purchased the day before one of the murders, and drove a red Fiat like defendant's) had obtained the murder weapon from defendant's friend, then used it in Santa Cruz to kill defendant's coworker who, when last seen alive, was scheduled to drive to Santa Cruz with defendant.

prove defendant committed those crimes, but it relied on them as aggravating circumstances under Penal Code section 190.3, factor (b) (criminal activity involving force or violence). Defendant contends this reliance was improper, the prosecutor committed misconduct in arguing those crimes to the jury, and defense counsel were incompetent for not objecting. He argues that because the guilt phase evidence was admitted only for the limited purpose of showing guilt, and the prosecution did not prove the crimes again at the penalty phase, "there was insufficient evidence . . . for the jury to find that those crimes constituted aggravating evidence . . . ."

The claims of insufficient evidence and misconduct are not cognizable on appeal because defendant failed to object or otherwise raise the issue at trial. (*People* v. *Montiel* (1993) 5 Cal.4th 877, 928 & fn. 23 [21 Cal.Rptr.2d 705, 855 P.2d 1277]; *Carpenter II, supra,* 15 Cal.4th at p. 413.) Moreover, any objection would have lacked merit. Defendant relies on *People* v. *Champion* (1995) 9 Cal.4th 879, 946-947 [39 Cal.Rptr.2d 547, 891 P.2d 93]. That case involved guilt phase evidence that was *unrelated* to any aggravating factor under Penal Code section 190.3. Nothing in that opinion suggests that the jury could not consider guilt phase evidence that *was* related to an aggravating factor. Evidence is admitted at the guilt phase, as in any criminal trial, solely to prove guilt, not to prove the presence or absence of aggravating or mitigating factors under Penal Code section 190.3. But the penalty jury may consider *all* evidence relevant to aggravation or mitigation, whether admitted at an earlier phase for another purpose or at the penalty phase. (Pen. Code, § 190.4, subd. (d); *People* v. *Medina* (1995) 11 Cal.4th 694, 778-779 [47 Cal.Rptr.2d 165, 906 P.2d 2].) In other words, the prosecution is not required to *prove again* at the penalty phase all guilt phase evidence that relates to an aggravating factor.

The prosecution presented overwhelming evidence at the guilt phase that defendant committed the Hansen/Haertle crimes. The crimes involved force and violence. The prosecution properly argued, and the jury properly considered, that evidence in aggravation under Penal Code section 190.3, factor (b).

### 3. *Admission of Defendant's Conviction for Escape*

Over defense objection under Evidence Code section 352, the court admitted evidence of defendant's 1970 conviction for escape. Defendant contends the court erred. We disagree for the reasons we stated in rejecting defendant's similar contention in *Carpenter II, supra,* 15 Cal.4th at page 402.

### 4. *Evidence of Prior Unadjudicated Criminal Acts*

 Defendant renews a number of arguments we have already rejected regarding the evidence of unadjudicated crimes. Because the court instructed

that the jurors may consider evidence of another crime only if they believed beyond a reasonable doubt he committed it, presenting the evidence did not infringe on the presumption of innocence. (*People* v. *Visciotti* (1992) 2 Cal.4th 1, 69-70 [5 Cal.Rptr.2d 495, 825 P.2d 388]; *People* v. *Benson* (1990) 52 Cal.3d 754, 809-810 [276 Cal.Rptr. 827, 802 P.2d 330].) The jury need not unanimously decide the truth of unadjudicated crimes. (*Carpenter II*, *supra*, 15 Cal.4th at p. 401.) Using a "death-qualified" jury is permissible. (*Id.* at p. 402.) The court did not err in admitting evidence of crimes for which charges were never brought or were dismissed as part of plea bargains, and on which the statute of limitations had expired. (*Ibid.*)

## 5. Limitations on Defense Expert Testimony

■ As at the first trial, Dr. Haney testified at length about defendant's incarceration in various institutions and other matters, and the court placed a few restrictions on the scope of that testimony. (*Carpenter II*, *supra*, 15 Cal.4th at pp. 403-404.) Defendant contends the court impermissibly limited the expert testimony in violation of his right to present mitigating evidence. We disagree. As we explained in greater detail in rejecting a similar contention in *Carpenter II*, the trial court retains discretion to exclude expert testimony, including hearsay testimony, that is unreliable or irrelevant, or whose potential for prejudice outweighs its proper probative value. (*Ibid.*)

"Each of the challenged rulings came within the court's discretion." (*Carpenter II*, *supra*, 15 Cal.4th at p. 403.) The court allowed Dr. Haney to testify that when he interviewed defendant's mother in 1983, she was "a very intelligent person, very complex, very strong even at an advanced age." It sustained as irrelevant other questions regarding what she was like at that particular interview, held two years after the crimes and many years after she raised defendant. The court also found irrelevant testimony about some of the details of her background, which was based on another doctor's report. Contrary to defendant's argument, however, the court did not exclude testimony concerning her "behavior." It permitted much evidence on that subject. Although it found that evidence of the mother's "upbringing . . . goes too far afield," it expressly permitted evidence about what the mother "did in relationship to" defendant. The court also excluded certain photographs from a 1947 newspaper article regarding conditions of confinement at Napa State Hospital, where defendant had been incarcerated. That ruling also came within the court's discretion, as did a similar ruling at the first trial. (*Carpenter II*, *supra*, 15 Cal.4th at pp. 403-404.)

As in the first trial, "The trial court allowed defendant reasonably wide latitude to present his mitigating evidence consistent with California law of

evidence. The few restrictions it placed on the extensive expert testimony neither abused its discretion nor violated defendant's right to present mitigating evidence." (*Carpenter II, supra,* 15 Cal.4th at p. 404.)

### 6. *Prosecution Expert Rebuttal Evidence*

At the first trial, the prosecution presented the expert testimony of Drs. Thomas Szasz and Stanton Samenow to rebut the defense expert testimony. (*Carpenter II, supra,* 15 Cal.4th at p. 405.) Defendant moved to exclude similar testimony at the second trial. At the hearing on the motion, the court stated it had read the transcript of the testimony at the first trial. It eventually allowed both experts to testify but restricted the scope of their testimony. Defendant contends the court erred in permitting them to testify at all.

Defendant contends Dr. Szasz's testimony violated his right to present mitigating evidence and to present a defense and was not proper expert testimony. We disagree for essentially the reasons we stated in rejecting defendant's similar arguments in *Carpenter II, supra,* 15 Cal.4th at pages 405-407. Defendant correctly notes that in *Carpenter II,* we found the contentions he makes here not cognizable because he failed to object on those grounds at trial. (*Id.* at p. 405.) However, we also rejected these contentions on the merits for reasons that apply here. The right to present a defense and mitigating evidence, including expert testimony, does not include the right to present evidence free from rebuttal by contrary expert testimony. (*Id.* at p. 406; see also *People v. Smithey, supra,* 20 Cal.4th at pp. 964-967.) We also note that, in an apparent attempt to weaken Dr. Szasz's credibility, defendant himself elicited much of the testimony that he now cites. Although defendant may argue that the court should not have allowed the witness to testify at all, he may not assert that testimony he elicited himself was itself inadmissible. (*People v. Moran* (1970) 1 Cal.3d 755, 762 [83 Cal.Rptr. 411, 463 P.2d 763].)

Defendant argues that Dr. Samenow's testimony violated his right to individualized sentencing. Again, we disagree for essentially the reasons we stated in rejecting defendant's similar argument in *Carpenter II, supra,* 15 Cal.4th at pages 407-408. As in the earlier trial, "The penalty jury certainly learned of defendant as a 'uniquely individual human being[]'; it heard a massive amount of evidence about defendant, including testimony from Dr. Samenow himself." (*Carpenter II, supra,* 15 Cal.4th at p. 408.) Indeed, in *Carpenter II,* defendant argued that the court's rulings in this trial restricting the witness's testimony showed that the earlier court erred. (*Id.* at p. 408.) We disagreed. But if, as we found, the earlier court's rulings were proper,

the rulings in this case, more favorable to the defense, were certainly not error of which defendant can. complain. Defendant makes one argument regarding Dr. Samenow he did not make in *Carpenter II*. He complains that some of the testimony was impermissible evidence of future dangerousness. The contention is not cognizable because defendant did not object on that ground at trial. (*Carpenter II, supra,* 15 Cal.4th at p. 405.) Moreover, to the extent Dr. Samenow's testimony might suggest defendant will remain dangerous, the testimony was proper rebuttal to the defense evidence. (*People* v. *Mattson* (1990) 50 Cal.3d 826, 878 [268 Cal.Rptr. 802, 789 P.2d 983].)

### 7. *Refusal to Give Special Instruction on the Meaning of Life Without Possibility of Parole*

Defendant contends the court erred in refusing to instruct the jury that the punishment for life without possibility of parole means "the defendant will be confined in prison until he dies, without the possibility of parole or release." The court did not err. (*People* v. *Arias* (1996) 13 Cal.4th 92, 172-173 [51 Cal.Rptr.2d 770, 913 P.2d 980].) The requested instruction in this case was worded slightly differently than the one in *Arias,* but, contrary to defendant's contention, it was identical in substance and contained the same inaccuracy.

Defendant attempts to distinguish *Arias* by arguing that here, unlike that case, the prosecutor "suggested" to the jury in argument that defendant might pose a threat to the community at large. (Cf. *People* v. *Arias, supra,* 13 Cal.4th at p. 173, fn. 30.) Defendant does not appear to, and cannot, directly challenge the prosecutor's argument on this basis, for he failed to object at trial. (*Carpenter II, supra,* 15 Cal.4th at p. 413.) Moreover, the prosecutor did not argue, or even "suggest," that defendant might be released into the community or otherwise pose a danger to the community outside prison. Defendant pulls from context widely scattered snippets of the prosecutor's lengthy summation and asserts that, in combination, they contain this suggestion. They do not.[8] Moreover, if defense counsel at trial believed the prosecutor made some improper suggestion, they could have objected and easily clarified the matter. They did not.

Defendant also argues the failure to give the instruction violated his right to present, and have the jury consider, mitigating evidence. It did not.

---

[8]As part of his chain of reasoning, defendant asserts the prosecutor "agreed that [defendant] would probably behave well in prison." However, the prosecutor agreed only that defendant had occasionally behaved well in prison in the past, not that he would behave in the future. In responding to defense evidence of certain good prison behavior, the prosecutor argued that defendant "did" behave on those occasions, and that "[t]here is absolutely no dispute that that's how he operated with those people in that particular context." Citing other evidence, the prosecutor then argued that even in the past, defendant had not always behaved well in prison.

Defendant was permitted to present, and did present, a wide array of evidence he considered mitigating. No one suggested to the jury that defendant might be released if given life without parole or that the jury should not consider any of the defense evidence.

### 8. *Other Contentions*

Defendant renews a number of arguments we have already rejected. California's death penalty law does not fail to narrow adequately the class of offenders eligible for the death penalty. Moreover, defendant, a serial killer, would be death-eligible under almost any reasonable narrowing scheme. (*Carpenter II, supra*, 15 Cal.4th at pp. 419-420.) Prosecutorial discretion in deciding whether to seek the death penalty is constitutional. (*Id.* at p. 421.) The court need not have instructed on burden and standards of proof more than it did. (*Carpenter II, supra*, 15 Cal.4th at pp. 417-418; *People v. Holt, supra*, 15 Cal.4th at pp. 682-684.) It need not instruct "on the presumption of life." (*People v. Arias, supra*, 13 Cal.4th at p. 190.) It need not delete inapplicable statutory factors or designate aggravating and mitigating factors. (*Carpenter II, supra*, 15 Cal.4th at pp. 420, 421.) The jury does not have to make written findings. (*Id.* at p. 421.) Proportionality review is not required. Moreover, if it were, it is inconceivable defendant would benefit from it. (*Ibid.*) The "Three Strikes" law did not abolish the death penalty. (*Ibid.*)

### 9. *Cumulative Prejudice*

Defendant contends the cumulative effect of guilt and penalty errors was prejudicial. There was, however, no error to cumulate. As in *Carpenter II*, this trial was "remarkably error free." (*Carpenter II, supra*, 15 Cal.4th at p. 422.) Moreover, for the reasons we stated in rejecting a similar contention in *Carpenter II*, this was not a close penalty case. (*Id.* at pp. 422-423.)

### III. CONCLUSION

The judgment is affirmed.

George, C. J., Baxter, J., Werdegar, J., and Brown, J., concurred.

**KENNARD, J.,** Concurring.—In *In re Carpenter* (1995) 9 Cal.4th 634 [38 Cal.Rptr.2d 665, 889 P.2d 985], I joined Justice Mosk's dissenting opinion, which concluded that this court should grant defendant's petition for writ of habeas corpus and vacate the judgment in its entirety on the ground that Jury Foreperson Barbara Durham was biased against him. (*Id.* at pp. 660-687 (dis.

opn. of Mosk, J., concurred in by Lucas, C. J., and Kennard, J.).) Although I have not departed from that view, the question whether Juror Durham was biased is not at issue here. As Justice Chin's majority opinion explains, none of the claims defendant raises in his appeal is meritorious. I therefore concur in the majority's reasoning and result.

**MOSK, J.**—I dissent.

I would have affirmed the judgment of the superior court on habeas corpus, in which, on the facts there disclosed, it granted relief to David Joseph Carpenter from its earlier judgment of death because the jury foreperson was demonstrably biased against him at trial. (*In re Carpenter* (1995) 9 Cal.4th 634, 660-687 [38 Cal.Rptr.2d 665, 889 P.2d 985] (dis. opn. of Mosk, J.).)

Therefore, I cannot now join in affirming the judgment of death on appeal.

Appellant's petition for a rehearing was denied January 19, 2000. Mosk, J., was of the opinion that the petition should be granted.