Filed 2/11/16  P. v. Sullivan CA1/5

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>CARL OTIS SULLIVAN,<br><br>    Defendant and Appellant. | A141851<br><br>(San Francisco City and County<br>Super. Ct. No. SCN220156) |

Carl Otis Sullivan appeals his conviction for residential burglary.  He claims the trial court erred in denying his challenge to an allegedly racially discriminatory peremptory challenge by the prosecution, admitting two of Sullivan's prior convictions to impeach him in the event he testified, excluding defense evidence, and failing to dismiss the action for insufficient evidence.  We affirm.

## I.    BACKGROUND

Sullivan was charged by information with felony first degree burglary (Pen. Code, § 459)[1] of April-Lynn Bond's apartment on Buchanan Street in San Francisco on October 10, 2012.  As amended, the information alleged that the crime was a violent felony because another person, not an accomplice, was in the residence at the time of the burglary (§ 667.5, subd. (c)(21)); that Sullivan had prior convictions for second degree burglary in 1993 and for burglary and robbery with a deadly weapon in 1998 within the meanings of sections 667, subdivisions (a)(1), (d) and (e) and 1170.12, subdivisions (b)

---

[1] Undesignated statutory references are to the Penal Code.

and (c); and that he served prior prison terms within the meaning of section 667.5, subdivision (b), for these crimes as well as a 1992 conviction for breaking and entering a vehicle and a 1998 conviction for possession of stolen property.

The case was tried to a jury. Bond testified that she lived in a one-bedroom apartment in a house on Buchanan Street. A flight of stairs from the sidewalk led to a walkway that in turn led to the front door of Bond's apartment on the side of the house. Her living room was just inside the building's front windows and was next to her bedroom.

At about 8:00 a.m. on October 10, 2012, Bond called in sick to work and planned to stay in bed. The window to Bond's bedroom was partially open and the blinds were down. The living room windows were closed and the blinds were down. Bond's purse, work bag, work computer, home computer, and wallet were on a table in the kitchen. While laying in bed, Bond heard voices and banging in an alleyway where the garbage and recycling are kept. It sounded like the speaker was engaging in a conversation. She then heard a very clear voice coming from inside her apartment saying something like, "Oh, dude, this is my worst fucking nightmare." Peeking through a gap in the doors to her bedroom, Bond saw Sullivan, whom she did not know, inside her apartment coming from the direction of the living room windows. Bond grabbed her phone, climbed out a bedroom window, and called 911 as she made her way to the street.[2]

Officer Matthew Lobre, who was dispatched in response to Bond's 911 call, arrived in uniform driving a patrol car. He spotted Bond and asked for a description of the intruder. She indicated there were two people and started to describe one as a White male with long scraggly hair and jeans when she interjected, "There he is, that's him." She pointed behind Lobre to Sullivan, who was walking down the front steps of her

---

[2] Bond's 911 call was played for the jury. Bond told the dispatcher that she thought someone was breaking into her house. She stated, "I just ran out of my bedroom window because someone came in my front window. [¶] . . . [¶] . . . It was 2 voices. And somebody said 'This is my worst fucking nightmare.' " Bond could be then be heard telling an arriving police officer to go up the first set of stairs.

building.  Lobre approached Sullivan and asked him to put his hands behind his back.  Sullivan was calm and cooperative.  As Lobre handcuffed him, Sullivan said, "This is my house.  What did she say?  She let me in."

When Bond reentered her apartment, she noticed the front window was open, the floor Sullivan had walked on was dirty, a nearby space heater had been unplugged, and a jacket and glove that did not belong to her were in the living room.  Her purse, work bag, work computer, home computer, and wallet and its contents were undisturbed.  None of the drawers in a living room bookshelf had been opened, and no other property was missing from her apartment.

Inspector Paul Doherty interviewed Sullivan in a hospital while he was treated for an abscess on his left forearm.  The interview was recorded and an edited version was played for the jury.  Sullivan told Doherty that he was willing to talk because he had done nothing wrong.  Doherty asked him, "So you've used—you said, uh, you've been up the last couple of days, but you're not under the influence right now.  You're sober and you feel good enough to talk to me about this incident?"  Sullivan responded, "Yeah, dude.  I've tried to go to sleep 10 times but I can't seem to be left alone."  Later in the interview Sullivan said, "I've been up for four fuckin' days.  No one wants to give me no food or water . . . ."  Doherty testified that Sullivan did not appear to be in pain during the interview, and he appeared to understand the questions that were posed to him.

Sullivan said he inherited part ownership of the building where Bond lived from a man he met in the park.  The man had left the property to Sullivan and a girl whose name was something like Emma or Maggie.  An attorney told Sullivan about the inheritance and said he would deliver paperwork to Sullivan at the home.  On October 10, 2012, the attorney, Sullivan and the girl met at the property.  "I went over there to meet her and talk about how we were gonna figure out the rent.  And she'd been living there for a while, too, since dude died."  When Sullivan arrived, the building was locked up and no one would answer the door.  Sullivan told the girl, "Listen, you can't keep me out of my own fuckin' house," and the girl "opened the window [and] told me I could go in there."  Sullivan said, "They don't go through doors, bro.  I'm telling you, man.  They go through

3

fuckin' windows, like a little leprechaun or something, dude." The girl went through the window with Sullivan, but then left through the same window. Sullivan said, "I just waited [about 20 minutes] for her [to return]. . . . And then I heard something and I looked out the door and there's a police officer. . . . And I came right out [through the window] . . . [¶] . . . [¶] . . . [a]s soon as he said something."

Sullivan told the officer that he had inherited the building, but he was still arrested for burglary. "I didn't burglarize shit, nothing's broken, nothing's missing. I didn't take nothing. That was not my intent. I was told that was my place and I was trying to hash out with this chick about how we're gonna handle the bills and—'cause I'm homeless. I'm moving in." He added, "I had no intent—I don't need no dope. I didn't get high since yesterday." Sullivan acknowledged that he left his coat, phone charger and glove in the apartment. Doherty asked Sullivan why Bond would say that he broke into her apartment, and Sullivan responded, "I don't think she wants me to live there to be honest with you. I think she wants the whole ball of wax for herself." Doherty did not investigate Sullivan's story because "I can't investigate every crazy story that's told me."

The prosecution rested following the testimony of Bond, Lobre, and Doherty. The trial court denied Sullivan's motion for a directed verdict pursuant to section 1118.1 on the charge of entry with the intent to commit theft.

Sullivan's only witness was Richard Osborn,[3] who testified that he was walking his child to school down Buchanan Street at about 8:00 a.m. on the day of the incident. He heard "some undecipherable noises coming from the bushes [in front of Bond's building], which was enough to startle us to kind of step away from the bushes, and keep going towards school." The noise was "[s]ort of a garbled speech. I couldn't decipher any of the words, but it was someone's voice." "[S]ort of grunting sounds, in a way," "maybe a little louder than a soft mumble." When he walked by again on his way back home, he saw "a gentleman standing in front of the bushes on the sidewalk. [¶] . . . I made an assumption that's probably whose voice we had heard before." The man was

_____

[3] As discussed *post*, Sullivan also called two police officers whose testimony was later stricken.

Caucasian with disheveled blonde shoulder-length hair and could have been Sullivan. "I noticed that he walked into the street, and I noticed a woman also crossing from the other side of the sidewalk. [¶] He seemed to walk towards her not aggressively, but it seemed . . . that maybe she was slightly avoiding him, walking away." Neither person seemed aggressive and Osborn did not see a need to intervene. However, he reported the incident to 911. Osborn did not return a call from the district attorney's office shortly before trial.

During deliberations, the jury asked for a readback of Osborn's testimony and asked, "How does the law permit us to consider the defendant's mental state?" The court responded, "Please review and follow instructions 225, 251, 1700, 1800, and 3406." The jury found Sullivan guilty of first-degree burglary and found true the allegation that a nonaccomplice was present in the residence at the time of the burglary (§§ 459, 667.5, subd. (c)(21)). Sullivan waived a jury trial on the prior offense and prison term allegations, and the court ultimately sentenced Sullivan to a total sentence of nine years in prison—four years (double the low term) for burglary as a second strike (§ 1170.12, subd. (c)) plus a five-year consecutive term for a serious felony prior (§ 667, subd. (a)(1)).

## II. DISCUSSION

### A. *Racial Discrimination in Jury Selection*

Sullivan first argues that the trial court erred in rejecting his objection to the prosecutor's peremptory challenge of an African-American male juror (Juror 3370857). He alleged that the challenge was discriminatory in violation of *Batson v. Kentucky* (1986) 476 U.S. 79, 84–89, 95–96 (*Batson*) and *People v. Wheeler* (1978) 22 Cal.3d 258, 276–277 (*Wheeler*). We conclude the trial court did not abuse its discretion in ruling that Sullivan failed to raise a prima facie case of discrimination.

#### 1. *Legal Standards*

The California and federal Constitutions forbid a prosecutor from excluding prospective jurors from a jury for a racially discriminatory purpose. (*Batson, supra,* 476 U.S. at pp. 84–89, 95–96; *Wheeler, supra,* 22 Cal.3d at pp. 276–277.) "The now familiar *Batson/Wheeler* inquiry consists of three distinct steps. First, the opponent of the

5

strike must make out a prima face case by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose in the exercise of peremptory challenges.  Second, if the prima facie case has been made, the burden shifts to the proponent of the strike to explain adequately the basis for excusing the juror by offering permissible, nondiscriminatory justifications.  Third, if the party has offered a nondiscriminatory reason, the trial court must decide whether the opponent of the strike has proved the ultimate question of purposeful discrimination." (*People v. Scott* (2015) 61 Cal.4th 363, 383.)

"A prima facie case of racial discrimination in the use of peremptory challenges is established if the totality of the relevant facts ' "gives rise to an inference of discriminatory purpose." ' (*Johnson*[*v. California* (2005)] 545 U.S. [162,] 168.) . . . [¶] . . . [Relevant evidence includes] that a party has struck most or all of the members of the identified group from the venire, that a party has used a disproportionate number of strikes against the group, that the party has failed to engage these jurors in more than desultory voir dire, that the defendant is a member of the identified group, and that the victim is a member of the group to which the majority of the remaining jurors belong. [Citation.]  A court may also consider nondiscriminatory reasons for a peremptory challenge that are apparent from and 'clearly established' in the record [citations] and that necessarily dispel any inference of bias.  ([Citation]; accord, *U.S. v. Stephens* (7th Cir. 2005) 421 F.3d 503, 518, 516 ['the examination of "apparent" reasons in the record . . . involves only reasons for the challenges that are objectively evident in the record' such that 'there is no longer any suspicion, or inference, of discrimination in those strikes . . .']; cf. *Williams v. Runnels* (9th Cir. 2006) 432 F.3d 1102, 1110 ['refutation of the inference requires more than a determination that the record could have supported race-neutral reasons for the prosecutor's use of his peremptory challenges . . .'].)" (*People v. Scott, supra,* 61 Cal.4th at p. 384.)

Where, as here, "(1) the trial court has determined that no prima facie case of discrimination exists, (2) the trial court allows or invites the prosecutor to state his or her reasons for excusing the juror for the record, (3) the prosecutor provides

6

nondiscriminatory reasons, and (4) the trial court determines that the prosecutor's nondiscriminatory reasons are genuine, an appellate court should begin its analysis of the trial court's denial of the *Batson/Wheeler* motion with a review of the first-stage ruling. [Citations.] If the appellate court agrees with the trial court's first-stage ruling, the claim is resolved. If the appellate court disagrees, it can proceed directly to review of the third-stage ruling, aided by a full record of reasons and the trial court's evaluation of their plausibility." (*People v. Scott, supra,* 61 Cal.4th at p. 391, fn. omitted.)

The appellate court applies "a deferential standard of review to the trial court's denial of a defendant's [*Batson/Wheeler*] motion, considering only whether the ruling is supported by substantial evidence." (*People v. Salcido* (2008) 44 Cal.4th 93, 136.)

2. *Background*

During voir dire, Juror 3370857 reported that he had been "robbed" twice (apparently, his home was burglarized) and his daughter's home had been burglarized just weeks previously. He volunteered, "I still . . . have to get the evidence to make sure, is that the person that did it, or did not." When asked to describe his background, he said, "[R]etired from the City and County of San Francisco. And my partner, she's retired from the City and County of San Francisco, San Francisco supervisor. . . . [¶] . . . [¶] [I was w]orking for Public Works. And I had about 15 guys working under me; I supervised them." He said that he had previously served on a jury. The court asked, "[Y]ou were on a civil jury about 15 years ago?" He replied, "Yes." A verdict was reached in the case. He then had the following colloquy with defense counsel about the trial:

"Q. You were on a jury 15 years ago to verdict. I didn't hear if it was civil or criminal.

"A. Civil. It was held here.

"Q. Eight-fifty Bryant? It might have been criminal. [¶] Do you remember what the case was about?

"A. Entrapment.

"Q. It was about entrapment? Was it a police officer that was on trial?

7

"A. Highway patrol was involved in it. And the defendant, you know, he thought he was being entrapped, you know, by both sides.

"Q. Was it a good experience for you?

"A. Yes.

"Q. Okay. Was it easy for the group to reach their verdict?

"A. Definitely.

"Q. . . . [W]hat made you say that? [¶] . . . [¶]

"[A.] The evidence was very, very convincing. And when you look at either side, you know. [¶] . . . [¶] . . . Well, you look at both sides of the evidence. And then you figure your mind, after you have your discussion with the group, then you come up with your verdict. [¶] That's how it went, we did it."

The prosecutor exercised a peremptory challenge to remove Juror 3370857 from the jury, and the court denied Sullivan's *Batson/Wheeler* objection. The court and counsel later made a record of the issue. Defense counsel argued, "[Juror 3370857] is the only African-American man in the grand venire, meaning all of the prospective jurors in the room. [¶] And I said that it did not appear there was any race-neutral reason for excusing him based on the testimony that is already in the record." The court ruled that Sullivan failed to make a prima facie case, explaining, "[M]erely stating that the opposing party has used its peremptory challenge to exclude a member of a particular group is not enough . . . ." The court nevertheless invited the prosecutor to state reasons for the challenge. The prosecutor said, "He described [the prior trial] as being 'civil,' then described it as being about 'entrapment.' [¶] The nature of his description, I think, suggested it was possibly a criminal trial, but . . . he described that he thought the defendant believed he was entrapped by both sides. [¶] And the way he described it demonstrated a lack of understanding of the issues and concentration on what potentially was a defense argument, rather than what the trial charges were. . . . [¶] And that lack of understanding due to attention [*sic*], possibly, was one of the bases. [¶] Secondly, . . . the juror explained that his wife was an ex-supervisor in San Francisco of political position and one that, if he experienced or shared any of her experiences at work, I think would

8

give him possible biases into the criminal process in the criminal court system." Defense counsel responded: "The prosecution said in the hallway [immediately after the challenge] things that are not what he is saying here. [¶] . . . [H]e made no mention of a wife being an ex-supervisor . . . . [¶] Second, the prosecutor made no reference to the idea that there might have been a civil or criminal trial mixup. I took very careful notes of the justification. [¶] . . . [¶] . . . [T]he prosecution did, *did*, in the hallway say that [Juror 3370857] spoke about the defendant in that case being entrapped by both sides. [¶] . . . [¶] I said that, in response to his statements in the hallway, . . . [the juror] said . . . the accused in that other case was entrapped by law enforcement, CHP and other non-CHP law enforcement." Defense counsel argued, "It is *not* a reasonable, justifiable interpretation of this record that the prosecutor here felt that [the juror] was confused about anything." The court then ruled that, even assuming a prima facie case had been made, the prosecutor's neutral reasons for the challenge were genuine. The court "especially" and "specifically" recalled that the juror "described the nature of the case that he had served on a jury on . . . 'entrapment'. . . , which is a legal defense."

       3.    *Analysis*

To establish a prima facie case, Sullivan argued Juror 3380857 was the only African-American man among the prospective jurors and no race-neutral reason for the prosecutor's challenge was evident. Sullivan did not elaborate on the latter ground. The former ground was not sufficient alone to establish a prima facie case. (See *People v. Hamilton* (2009) 45 Cal.4th 863, 899 [trial court "correctly rejected defendant's argument that the challenge of the only Black person subject to challenge was sufficient in itself to suggest a pattern" of discrimination to support a prima facie case]; see also *People v. Panah* (2005) 35 Cal.4th 395, 442 [claim of prima facie case "was particularly weak as it consisted of little more than an assertion that a number of prospective jurors from a cognizable group had been excused"].) Moreover, the prosecutor questioned whether Juror 3770857 was the only African-American male in the venire and Sullivan cites no evidence to support the claim that he was. Nor do the other factors listed in *People v. Scott, supra,* 61 Cal.4th at page 384 support Sullivan's alleged prima facie case: Sullivan

cites no evidence that the prosecutor "struck most or all of the members of the identified group from the venire" or "used a disproportionate number of strikes against the group." The court noted that an African-American woman in the venire had been appropriately challenged for cause because she volunteered that she had been the victim of attempted and completed residential burglaries. Sullivan does not claim or demonstrate that the prosecutor failed to engage African-American jurors in more than desultory voir dire, and the record does not suggest that he did so. Moreover, Sullivan was not African-American himself and did not demonstrate that Bond was a member of the group to which a majority of remaining jurors belonged. Under our deferential standard of review (see *People v. Salcido, supra,* 44 Cal.4th at pp. 136–137), we see no abuse of discretion in the trial court's finding of no prima facie case of discrimination.

If we were to proceed to the third step of the *Batson/Wheeler* analysis, we would likewise conclude that the trial court did not abuse its discretion in finding that the challenge was not racially discriminatory. Sullivan argued below that "the record will speak for itself about whether or not [Juror 3370857] even made a mixup. The record will be clear that [the prospective juror] said that he was part of a criminal trial." In fact, the record tends to support the prosecutor's position that the juror was confused about the nature of the prior case. The trial court, which had the advantage of witnessing the voir dire in person and observing the prosecutor's demeanor in defending the challenge (see *People v. Lenix* (2008) 44 Cal.4th 602, 626–628), also did not abuse its discretion in ruling that the juror's focus on the legal defense in the prior trial was a genuine race-neutral ground for the challenge.

B.      *Impeachment Evidence*

Sullivan argues the trial court erred in allowing the prosecutor to impeach him with evidence of prior burglaries in the event he chose to testify at trial. There was no error.

1.      *Legal Standards*

"Article I, section 28, subdivision (f)[(4)], of the California Constitution—which was adopted on June 8, 1982, when the voters approved an initiative measure designated

10

on the ballot as Proposition 8—declares in pertinent part that 'Any prior felony conviction of any person in any criminal proceeding . . . shall subsequently be used without limitation for purposes of impeachment . . . in any criminal proceeding.' [¶] . . . '[P]rior felony convictions' within the meaning of [this provision] are such as necessarily involve moral turpitude, i.e., a readiness to do evil." (*People v. Clair* (1992) 2 Cal.4th 629, 653–654.)  Felonies involving theft are crimes of moral turpitude.  (See *People v. Carpenter* (1999) 21 Cal.4th 1016, 1056; *People v. Muldrow* (1988) 202 Cal.App.3d 636, 645 [burglary].)  Trial courts nevertheless "retain their discretion under Evidence Code section 352 to bar impeachment with such convictions when their probative value is substantially outweighed by their prejudicial effect.  [Citations.] . . . [I]n exercising their discretion, trial courts should continue to be guided—but not bound—by the factors set forth in *People v. Beagle* (1972) 6 Cal.3d 441, and its progeny." (*Clair,* at p. 654.)  The *Beagle* factors are "(1) whether the prior conviction reflects on honesty and integrity; (2) whether it is near or remote in time; (3) whether it was suffered for the same or substantially similar conduct for which the witness-accused is on trial; and, (4) finally, what effect admission would have on the defendant's decision to testify." (*People v. Castro* (1985) 38 Cal.3d 301, 307.)  Crimes involving dishonesty are more probative of credibility than violent crimes, and remoteness makes a crime less probative of credibility "if [the crime] occurred long before [the current trial] and has been followed by a legally blameless life." (*Beagle*, at p. 453.)

> 2.  *Background*

Before trial, the prosecutor sought leave to impeach any testimony by Sullivan with his three 1998 felony convictions (robbery with a deadly weapon, burglary and possession of stolen property) and 1993 and 1992 felony auto burglary convictions. Sullivan argued the offenses were remote in time, even though he had been incarcerated for most of the intervening years.  "I would ask the Court to not allow the jury to speculate about his credibility in this case from a 16-year-old incident. [¶] . . . [¶] . . . He had no crimes or convictions while incarcerated. . . . [H]e was released on parole and discharged on parole without any new convictions."

The court ruled that the prosecutor would be allowed to impeach Sullivan with two of the priors and excluded three others. "[I]n considering the remoteness of the crime [the court] does take into account . . . that [Sullivan] has been incarcerated for 15 of the last 16 years since the 1998 convictions. [¶] The Court also has considered the similarity to the crimes charged in this case, but . . . all of the convictions . . . relate to either burglary or possession of stolen property . . . [or] robbery. [¶] . . . [¶] The Court has also considered the fear of impeachment that could lead to refusal to testify . . . . [¶] . . . [C]learly, . . . all of the convictions do relate very strongly to honesty and veracity. [¶] . . . [T]here will not be an undue amount of time or confusion to the jury or anything else in putting evidence of the convictions before the jury. [¶] . . . [T]he Court will allow impeachment relating to the . . . residential burglary conviction and the possession of stolen property conviction in or about 1998. [¶] The Court excludes conviction of the robbery with use of a deadly weapon on the basis that under [Evidence Code section] 352 that conviction is much more inflammatory and serious than a burglary conviction. . . . [¶] As to the 1992 and 1993 convictions, the Court does find that they are too remote in time. They are well over 20 years old, and [Sullivan] was clearly out of prison for some time before the commission of the 1998 conviction. [¶] And the Court also finds that in light of the fact that the Court has admitted certain prior convictions . . . for impeachment purposes, that admitting more . . . far exceeds the probative value and could well lead to the defendant refusing to testify at trial. [¶] Also, the prior convictions both were burglary type convictions . . . similar to the charge in this case . . . ."

3. *Analysis*

The trial court did not abuse its discretion in allowing two prior convictions to be used to impeach Sullivan, while excluding three others. The court admitted two convictions that reflected on Sullivan's dishonesty (burglary and receipt of stolen property) and excluded the most violent and inflammatory offense (robbery with a dangerous weapon). It reasonably found that the allowed 1998 convictions were not too remote because Sullivan had been incarcerated for 15 of the 16 intervening years. (See *People v. Carpenter, supra,* 21 Cal.4th at pp. 1055–1056 [no abuse of discretion in

12

allowing defendant to be impeached by 17-year-old convictions where defendant had been incarcerated for most of the intervening time].)  Nevertheless, the court excluded two convictions that were even more remote.  The court acknowledged that the admitted convictions were similar to the charged offenses, but concluded that similarity could not be avoided (because all of the convictions were similar to the charged offense) without allowing Sullivan to benefit from "a false aura of veracity" if he testified in his own behalf.  (*People v. Beagle, supra,* 6 Cal.3d at p. 453.)  Finally, the court ruled that admitting the two 1998 convictions would not *unduly* pressure Sullivan not to testify because the most inflammatory prior had been excluded, as had two prior auto burglary convictions.  Again, Sullivan was not entitled to the false aura of veracity that would result if he were not impeached with any of his five prior felony convictions.

Sullivan argues the trial court should have sanitized the convictions, but he fails to demonstrate that it was an abuse of discretion for the trial court to decline to do so. (Citing *People v. Valentine* (1986) 42 Cal.3d 170, 182, fn. 8 [trial courts *may* sanitize convictions when exercising discretion under current Proposition 8 regime]; *People v. Barrick* (1982) 33 Cal.3d 115, 126–128 [sanitizing similar or identical prior convictions not permissible before Proposition 8], superseded by constitutional amendment as held in *People v. Castro, supra,* 38 Cal.3d at pp. 308–309, 312.)  However, he cites no authority that would support the conclusion that the trial court abused its discretion in declining to sanitize the convictions in this particular case.  The trial court may reasonably have concluded that sanitized evidence of the prior convictions would have been confusing to the jury or even prejudicial to Sullivan himself.  (See *People v. Rollo* (1977) 20 Cal.3d 109, 119–120, superseded by constitutional amendment as held in *Castro*, at pp. 308–309, 312.)  We cannot find the court's ruling was an abuse of discretion.

C.    *Exclusion and Striking of Defense Evidence*

Sullivan argues that the trial court erred in excluding and striking evidence he wanted to present at trial.  First, he argues the court erred in excluding testimony by the jail triage nurse who conducted a health intake interview of Sullivan following his arrest. Second, he argues the court erred in striking testimony by police investigators about

13

suspected heroin found in the jacket Sullivan left in Bond's apartment. Sullivan argues both types of evidence would have supported his theory that he lacked the necessary intent for burglary. There was no error.

1.  *Legal Standards*

Only relevant evidence is admissible at trial. (Evid. Code, § 350.) " 'Relevant evidence' means evidence . . . having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (*Id.*, § 210.) Even relevant evidence may be excluded at the discretion of the trial court if "its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (*Id.*, §352; see *People v. Rodriguez* (1999) 20 Cal.4th 1, 9.) The court's discretion to exclude evidence extends to expert testimony. (*People v. Page* (1991) 2 Cal.App.4th 161, 187.) "The abuse of discretion standard of review applies to any ruling by a trial court on the admissibility of evidence. [Citation.] This standard is particularly appropriate when, as here, the trial court's determination of admissibility involved questions of relevance . . . and undue prejudice." (*People v. Guerra* (2006) 37 Cal.4th 1067, 1113, disapproved on other grounds in *People v. Rundle* (2008) 43 Cal.4th 76, 151.)

2.  *Exclusion of Jail Triage Nurse's Testimony*

Joselito Borja testified during an Evidence Code section 402 hearing that, as a triage nurse at the San Francisco County Jail, he determined whether incoming inmates could be housed in jail or needed hospital care, and whether inmates needed medical care while in jail. Borja asked a predetermined set of questions during a very short encounter with an incoming inmate and recorded the answers. At about 8:43 p.m. on October 11, 2012, he triaged Sullivan. He noted that Sullivan had a dressing on his arm due to an incision and drain procedure that had been performed on an abscess while Sullivan was at the hospital. Sullivan admitted using heroin intravenously, and Borja knew that abscesses could form from intravenous drug use. Sullivan told Borja he had last taken heroin two days previously and would be "kicking from heroin" while in jail. He complained of shakes, but Borja did not personally observe Sullivan shake. Borja

14

testified there was no set time frame for withdrawal from heroin, but "per our standardized procedure, we start monitoring patients from going into withdrawal within 72 hours after [their] last dose."

Defense counsel urged the court to qualify Borja as an expert in determining the health status of patients, assessing the required level of care for patients, and describing heroin withdrawal. The court excluded the evidence: "I find that Mr. Borja is not qualified in any of the areas designated by the defense. [¶] Furthermore, I find that the areas designated by the defense are completely irrelevant to the issue of whether or not [Sullivan] was intoxicated at the time of the incident. [¶] I further find that the witness testified basically that his opinions were based on what [Sullivan] told him." The court further stated that, even if the witness were a qualified expert on a relevant issue, it would exercise its discretion under Evidence Code section 352 to exclude the testimony as a subterfuge to introduce self-serving hearsay statements by Sullivan into evidence.

The court did not abuse its discretion in excluding Borja's testimony. First, the only proffered relevant issue for the testimony was Sullivan's alleged intoxication at the time of his entry into Bond's apartment. Borja's testimony, however, did not tend to prove or disprove this fact. Borja repeated Sullivan's statement that that he *used* heroin (and presumably became intoxicated) approximately a day *before* the incident, as well as Sullivan's statement that he expected to go into heroin *withdrawal* soon after he entered the jail, which was a day *after* the incident. Borja did not testify, and Sullivan offered no other evidence, that Sullivan's alleged use of heroin a day before the incident would have caused him to be intoxicated at the time of the incident, or that Sullivan's self-reported shaking at the time of triage was evidence that he had been intoxicated during the incident.

Second, Borja simply repeated Sullivan's statements about these matters. Ordinarily, Sullivan's out-of-court statements, if offered to prove the truth of the matters stated, would be inadmissible hearsay. (Evid. Code, § 1200.) Sullivan attempted to admit the statements as part of the basis for an expert opinion by Borja about Sullivan's condition. (See *id.*, §§ 801, subd. (b), 721, subd. (a)(3).) However, Sullivan failed to

15

establish Borja's expertise in heroin withdrawal or intoxication. The only evidence Sullivan presented on the expert qualification issue was Borja's status as a registered nurse and his position as a jail triage nurse. Although these facts might support an inference Borja had some experience with narcotic intoxication and withdrawal, the trial court did not abuse its discretion in ruling that it was insufficient to qualify him as an expert on the proffered issues. (See *People v. Jones* (2013) 57 Cal.4th 899, 951 [qualification ruling reviewed for abuse of discretion].) Nor did Borja offer an opinion on Sullivan's condition during his testimony. Moreover, the court reasonably exercised its discretion to exclude the evidence, even assuming Borja was a qualified expert, on the ground that the defense was improperly attempting to introduce inadmissible hearsay under the guise of expert testimony. (See *Grimshaw v. Ford Motor Co.* (1981) 119 Cal.App.3d 757, 789.)

3.    *Striking of Police Investigators' Testimony*

San Francisco Police Sergeant Lyn O'Connor, who worked in crime scene investigations, testified that inside the jacket left in Bond's apartment she found suspected marijuana, suspected heroin, a lighter, a broken glass pipe, and a syringe. She delivered the suspected heroin to Sergeant Carla Hurley for testing, and Hurley testified that she conducted a presumptive test for narcotics on the sample, which was inconclusive. Hurley explained that suspected heroin with an inconclusive presumptive test often tests positive with a confirmatory test. As far as Hurley knew, no confirmatory test was performed on the sample she tested. Hurley also testified that the "substance that [she] did the presumptive test on" weighed "less than .10," presumably meaning less than 0.1 gram.

The prosecutor successfully moved to strike O'Connor's and Hurley's testimony. The prosecutor argued their testimony invited the jury to speculate that the substance found in the jacket was heroin and then to further speculate that Sullivan was intoxicated at the time of his entry into the apartment. Sullivan argued the evidence did not invite mere speculation because of corroborating evidence of intoxication at or near the time of the incident: Sullivan's possession of suspected heroin; Osborn's testimony that he heard

indistinct sounds near Bond's apartment; several witnesses' description of Sullivan's appearance as disheveled; Sullivan's statement to Doherty, which the jury could find was delusional; and Sullivan's specific statements to Doherty that he was unable to sleep and that he had used "dope" the previous day. Sullivan argued the testimony was also relevant to motive—i.e., his possession of heroin undermined any inference that he entered the apartment to steal so he could buy drugs. On motive, the prosecutor responded that it did not "logically follow [that] he doesn't need to steal to support his habit because he already has some, when it is a miniscule amount, if anything."

The court struck the testimony and instructed the jury to disregard it. The court noted that "even [Sullivan's] statement said, 'I didn't get high since yesterday.' [¶] So there is absolutely zero evidence that's been presented that [he] used any intoxicating drugs that caused an intoxicating effect at the time that would thereby warrant a voluntary intoxication instruction." Thus, the testimony was irrelevant even if it established Sullivan's possession of actual rather than suspected heroin. The court also found the evidence irrelevant to motive. Further, even assuming the evidence was relevant, its very weak probative value justified exclusion under Evidence Code section 352.

The trial court did not abuse its discretion in striking the evidence. The officers' testimony was weak evidence of drug possession and only marginally supported an inference that Sullivan was intoxicated at the time of the incident. Much stronger direct evidence of his mental state at the time of the incident had been presented to the jury and heard by the trial court: Bond's testimony about Sullivan's statements in or near her apartment; Lobre's observations when he encountered Sullivan leaving Bond's building; Doherty's observation of Sullivan in the hospital; and the content and tone of Sullivan's statements to Doherty, a recording of which was played in court. Having directly observed these witnesses and listened to the recording, the court reasonably could have found that the intoxication theory lacked credibility and, therefore, that the danger that the officers' testimony might mislead the jury substantially outweighed the testimony's probative value. We cannot find an abuse of discretion on this record.

17

D.     *Sufficiency of the Evidence of Burglary*

Finally, Sullivan argues the jury was presented with insufficient evidence to support his conviction for burglary. Specifically, he argues the court should have granted his section 1118.1 motion after the close of the prosecution's case-in-chief. There was no error.

" 'To determine the sufficiency of the evidence to support a conviction, an appellate court reviews the entire record in the light most favorable to the prosecution to determine whether it contains evidence that is reasonable, credible, and of solid value, from which a rational trier of fact could find the defendant guilty beyond a reasonable doubt.' [Citations.] 'Where, as here, the jury's findings rest to some degree upon circumstantial evidence, we must decide whether the circumstances reasonably justify those findings, "but our opinion that the circumstances also might reasonably be reconciled with a contrary finding" does not render the evidence insubstantial.' " (*People v. Tafoya* (2007) 42 Cal.4th 147, 170.)

Burglary requires proof of "an entry into a specified structure with the intent to commit theft or any felony." (*People v. Tafoya, supra,* 42 Cal.4th at p. 170.) "One may [be] liable for burglary upon entry with the requisite intent to commit a felony or a theft (whether felony or misdemeanor), regardless of whether . . . any felony or theft actually is committed." (*People v. Montoya* (1994) 7 Cal.4th 1027, 1041–1042.)

Here, Sullivan was alleged to have entered a residence while a nonaccomplice was present. Bond's testimony that Sullivan entered her apartment through a window while she was in her bedroom was sufficient evidence to establish the conduct elements of both the charged crime and the sentencing enhancement. Sullivan's intent to commit theft was supported by circumstantial evidence: the manner of entry suggested an awareness of unauthorized entry (as did Bond's testimony that she did not know Sullivan); the fact of unauthorized entry supported an inference of an improper purpose in entering; Sullivan's handling of items (i.e., moving the space heater) and walking toward a room where valuables were located supported an inference that the improper purpose was property-related. The jury could infer based on their common experience that the improper

18

property-related purpose of Sullivan's entry was some form of theft.  Although the evidence of Sullivan's intent was circumstantial, the jury could have found that the only reasonable inference was that Sullivan had a guilty rather than an innocent intent (see CALCRIM No. 224) because Sullivan's uncorroborated and highly improbable explanation for his entry into the apartment lacked all credibility.  We conclude the verdict was supported by substantial evidence.

### III.    DISPOSITION

The judgment is affirmed.

_____

BRUINIERS, J.


WE CONCUR:


_____

JONES, P. J.


_____

NEEDHAM, J.


A141851