Filed 6/17/22  P. v. Thomas CA1/4

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>            Plaintiff and Respondent,<br>v.<br>JAMES EDWARD THOMAS,<br>            Defendant and Appellant. | A160532<br><br>(Alameda County<br>Super. Ct. No. 613342) |

James Edward Thomas appeals three convictions for possessing and transporting cocaine base and cannabis for sale. He contends that the court erred in denying his motion to suppress evidence found in his apartment when police officers searched it pursuant to an anticipatory warrant, which authorized the search of his apartment only if, upon a search of his person or vehicle, he was found to have a key to the apartment in his possession. He also contends that he identified one of the many keys found on his person as the key to his apartment as the result of an unlawful arrest, violation of his rights under *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*), and coercion in violation of the due process clause. We conclude that probable cause supported issuance of the warrant, that the lawful discovery of the keys in Thomas's possession made discovery of the drugs in his apartment inevitable, and that any possible illegality in the manner in which officers induced Thomas to identify the key thus provided no basis for suppression. We will thus affirm.

1

## Factual[1] and Procedural History

In February 2016, Berkeley Police Sergeant Craig Lindenau executed an affidavit in support of a request for a warrant authorizing a search of Thomas, a Ford van he controlled, and, conditionally, apartment 29 at 795 Sycamore Avenue in Hayward (the apartment). The search would be for cocaine and materials associated with its use, sale, or transport. The proposed warrant identified the apartment as an "anticipatory location," and Lindenau's supporting affidavit stated, "When I [execute] this warrant on Thomas['s] person and vehicle, I believe that I will find keys in his possession or vehicle that will unlock the door to [the apartment] (triggering event). If Thomas['s] keys unlock [the apartment], I am requesting authorization to search the apartment . . . ."

The affidavit stated that Lindenau was investigating Thomas's suspected sale and possession for sale of cocaine, aided by two confidential informants, X and Y, who each had a history of using cocaine, of reliably informing the police about drug dealers, and of buying drugs under police supervision. The affidavit—executed on February 10, 2016—detailed how X had told Lindenau in October 2015 that Thomas was selling cocaine; Y had said the same in January 2016; under Lindenau's supervision X had bought what was confirmed to be cocaine from Thomas in November 2015; and X or Y had reported buying cocaine from Thomas in mid-December 2015, "[w]ithin 72 hours of 1/26/16," and "[w]ithin 72 hours of 2/2/16."

The affidavit also stated that, in October 2014, an Accurint check had shown the apartment as Thomas's address, although his driver's license and

---

[1] Because Thomas challenges only the admissibility of some of the evidence at his trial, and not its sufficiency, we recount only the evidence related to the validity of the warrant and the legality of the police officers' conduct in executing it.

vehicle registrations listed a post office box in Fairfield. Lindenau explained that 795 Sycamore Avenue was a secure apartment building, so he had not been able to see Thomas enter or exit the apartment, but he had seen his Ford van parked near the building many times between December 2015 and February 2016, including the day before the warrant was requested, when it was parked across the street from the building. The affidavit opined, based on Sergeant Lindenau's training and experience with drug dealers, that the apartment, if under Thomas's control, would contain illegal drugs and materials related to their sale.

A magistrate issued the warrant at 9:31 p.m. on February 10, 2016, authorizing a search of Thomas, of the van, and, if a key to the apartment were found in his possession or in the van, of the apartment. As to the latter, the warrant read, "Anticipatory location: Having determined that probable cause for the search of [the apartment] will result when the triggering event described in the supporting affidavit occurs; and, furthermore, that there is probable cause to believe that this triggering event will occur; it is ordered that the search of [the apartment] shall be executed without undue delay upon the occurrence of the triggering event." The affidavit described the triggering event as follows: "When I serve this warrant on Thomas['s] person and vehicle, I believe that I will find keys in his possession or vehicle that will unlock the door to [the apartment]."

About an hour after the court issued the warrant, Sergeant Lindenau directed Officer Joseph Ledoux to stop the van identified in the affidavit and execute the warrant. Ledoux did so on Interstate 80, leading to a search of Thomas and the van on the highway shoulder.

At the preliminary hearing, Officer Ledoux and Sergeant Lindenau testified about the execution of the warrant. Ledoux testified that after he

3

stopped the van he searched Thomas and found, among other things, three key rings in his pocket. When asked what he did with the keys, Ledoux responded that Thomas "pointed out the key that unlocked his apartment on Sycamore," to which defense counsel objected on foundation grounds. The court took the objection under submission, and Ledoux then testified that he gave the keys to Sergeant Lindenau and that he thought it was Lindenau who asked Thomas about the keys. The court later asked Ledoux directly how he knew that Thomas had pointed out the key that later unlocked the apartment. He answered, "So myself and Sgt. Lindenau were present with the recovery of those three sets of key chains, asked him which opened the door so we wouldn't have to open up the door with a battering ram. He pointed out a key. Sgt. Lindenau then informed me [after the subsequent search of the apartment] that that was the key that opened the door."

The prosecutor elicited from Sergeant Lindenau a summary of his conversation with Thomas: "Q. . . . [W]hen you contacted Mr. Thomas what was the conversation with him? A. I told him who I was and that I had a search warrant for him and his vehicle and his house. And I asked him to direct me to his key to [the apartment]. Q. Did he show you which key? A. Yes." On cross-examination, defense counsel elicited that the conversation had occurred while Thomas was handcuffed in the back of a police car. Asked if he had advised Thomas of his *Miranda* rights, Lindenau replied, "No. I explained to Mr. Thomas that he was not under arrest, and that he was being detained in handcuffs while we served a search warrant." He denied having told Thomas that if he "didn't tell you which key opened the door that you would break down the door," or he "would have to pay damages for the door," or "anything to that effect."

On redirect, Lindenau testified, "I advised him that he was not under arrest, that we had a search warrant for him and his vehicle and his residence at [the apartment]," and "I asked him to point out the key that would open that door." The court then questioned Lindenau directly: "Do you remember the words you used when you . . . advised him to point out the key?" He responded, "[T]here was a negotiation back and forth . . . . He stated that he wasn't going to tell me unless we brought him to the Sycamore address with us. I promised him that we would take him. And it was kind of a back-and-forth where he didn't believe me, . . . he wanted to go there first, and then he would point out the key, and . . . me reassuring him . . . that I would take him. Eventually he pointed [it] out to me on Highway 80. It was probably less than a two-minute conversation, and then we proceeded to the [apartment]." The court then asked, "[D]o you remember what you actually said to him before this negotiation began . . . ? [¶] [A:] I was looking at three . . . large key rings, and I asked him to point out the key to [the apartment]. And he stated that he would do that if we took him to the address. [¶] The Court: Why did you ask him . . . to point out the key that opened the address [*sic*] at Sycamore? [¶] [A]: It is a common practice on every search warrant we do so we don't have to damage the door. But in this specific situation it was an anticipatory search warrant, and without him possessing the key to [the apartment], the search warrant [*sic*] was not authorized."

At the preliminary hearing, Thomas argued that in eliciting his identification of the key the police had violated his *Miranda* rights. He contended that the questioning was a custodial interrogation, and that the response about the key was incriminating because it fulfilled the condition for the anticipatory warrant. The court ruled that, although "I technically suspect [Thomas was] not free to leave," he was not in custody so as to trigger

a right to *Miranda* warnings and, in any case, asking him to identify the key to the apartment was similar to asking permission to search and did not amount to an interrogation likely to yield an incriminating response.

Thomas subsequently filed a pretrial motion to quash the anticipatory warrant and suppress the evidence seized in the search of the apartment. He contended that there had been no probable cause to believe that the triggering event, being found in possession of a key to the apartment, would occur, and that the officers violated his right to due process by coercing him to acknowledge he had such a key by threatening to break down the apartment door. He did not contend there was a lack of probable cause to believe contraband would be found at the apartment.

The court denied the motion. The prosecutor was prepared to have Lindenau testify, but the court deemed it unnecessary. The court readily found probable cause to issue the warrant. As to the key, it reasoned as follows: "there's a contradiction whether or not one of the officers says, 'Well, if you don't let us in we'll kick in the door.' The officer who was the search warrant author said that was not what was said. But the point was, in fact they had all the keys out of his pocket, they would have taken those keys to determine whether or not they fit the lock. In fact, they had somewhat of a shortcut because if you believe he actually was asked about whether or not there was keys that fit the door and if you don't give it to us we'll kick it in, I don't think the record reflects that, but if that's what was said inevitably they would have discovered one of those keys would have fit because they had a search warrant."

A trial ensued at which the jury found Thomas guilty of possessing cocaine base for sale (Health & Saf. Code, § 11351.5), possessing cannabis for sale (*id.*, § 11359), and transporting more than 28.5 grams of cannabis for

sale (*id.*, § 11360, subd. (a)).[2] The court sentenced him to four years in prison, and he timely appealed.

## Discussion

1. *Probable Cause Supported the Issuance of the Search Warrant.*

Thomas contends that the affidavit did not set forth probable cause to believe either that contraband would be found at the apartment or that the police would find him in possession of a key to the apartment.[3] We disagree.

"The question facing a reviewing court asked to determine whether probable cause supported the issuance of the warrant is whether the magistrate had a substantial basis for concluding a fair probability existed that a search would uncover wrongdoing. [Citations.] 'The task of the issuing magistrate is simply to make a practical, commonsense decision whether, given all the circumstances set forth in the affidavit . . . , including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place.' " (*People v. Kraft* (2000) 23 Cal.4th 978, 1040–1041; *United States v. Leon* (1984) 468 U.S. 897, 914 [the "strong preference for warrants" means that " 'in a doubtful or marginal case a search under a warrant may be sustainable where without one it would fall.' "].) A showing

---

[2] The jury found Thomas not guilty of transporting methamphetamine for sale (Health & Saf. Code, § 11379, subd. (a)) or manufacturing concentrated cannabis (*id.*, § 11379.6, subd. (a)); it did not reach a verdict on charges of manufacturing cocaine base (*ibid.*), possessing methamphetamine for sale (*id.*, § 11378), and possessing heroin for sale (§ 11351).

[3] The Attorney General contends that Thomas forfeited any challenge to the existence of probable cause to believe that there were drugs at the apartment by failing to raise the issue below. Thomas disagrees and argues in the alternative that, if he did forfeit the issue, his trial counsel provided ineffective assistance. Because we conclude that probable cause did exist, we need not address those contentions.

of probable cause need not include "direct evidence" and may include evidence inadmissible at trial, such as allegations on information and belief. (*People v. Lazarus* (2015) 238 Cal.App.4th 734, 764.) In reviewing a ruling on a motion to suppress under Penal Code section 1538.5, "[w]e defer to the trial court's factual findings, express or implied, where supported by substantial evidence. In determining whether, on the facts so found, the search or seizure was reasonable under the Fourth Amendment, we exercise our independent judgment." (*People v. Glaser* (1995) 11 Cal.4th 354, 362.)

"Anticipatory warrants are . . . no different in principle from ordinary warrants. They require the magistrate to determine (1) that it is now probable that (2) contraband [or] evidence of a crime . . . *will be* on the described premises (3) when the warrant is executed." (*United States v. Grubbs* (2006) 547 U.S. 90, 96.) But to show cause for such a warrant, "two prerequisites of probability must be satisfied." (*Ibid.*) The affidavit must provide information enabling a magistrate to determine "not only that if the triggering condition occurs 'there is a fair probability that contraband or evidence of a crime will be found in a particular place,' [citation], but also that there is probable cause to believe the triggering condition *will occur*." (*Id.* at pp. 96–97.)

On the initial question of whether probable cause existed to believe that the triggering condition would occur, such cause was reasonably found from the facts that an Accurint report from 16 months earlier listed the apartment as Thomas's address; there was no evidence of his having subsequently used any other residential address; and Sergeant Lindenau had seen Thomas's van parked near the Sycamore Avenue building several times, including the day before the warrant application was prepared. Those facts more than suffice to support a "practical, commonsense decision" (*People v. Kraft, supra,*

23 Cal.4th at p. 1040) that it was fairly probable that Thomas resided at the apartment. While Thomas notes that Lindenau "never saw appellant come and go to [the apartment]," Lindenau's affidavit explained that he could not have done so because 795 Sycamore Avenue was a secure apartment building.

The affidavit also offered probable cause to believe that the apartment, if Thomas's residence, would contain drugs or evidence of drug dealing. Two informants had told Lindenau within the past four months that Thomas was selling cocaine; one had, under Lindenau's supervision, bought what was confirmed to be cocaine from Thomas just over three months before; and the informants had told Lindenau three times in the preceding three months that Thomas had sold them cocaine—including, most recently, eight days before the application. Thomas contends that the information was "stale," citing decisions holding lapses of three months or 34 days between drug sales and searches excessive (see, e.g., *Hemler v. Superior Court* (1975) 44 Cal.App.3d 430, 433). However, while some of the information was several weeks or months old, the several reports described a stream of ongoing sales of cocaine, the most recent of which occurred only eight days before the application.

Thomas notes that the affidavit's allegations connecting his suspected drug dealing to the apartment were generic and unconnected to any observation of him. The affidavit noted simply that drug dealers in general usually "do not carry their entire supply on their person" but often keep it "hidden in their residence and vehicles," and that they "often keep items . . . to assist in packaging, cutting, weighing, and distributing drugs," often "use illegal drugs themselves" and thus "maintain a personal supply . . . as well as their sales supply," and often "maintain safes or other secure containers within homes or vehicles . . . to store drugs and money." However, Thomas cites no authority rejecting a magistrate's reliance on the proposition that

9

drug dealers are likely to have drugs or evidence of their illegal activity in their residence.

Two decades ago, this court observed that while " ' "[m]ere evidence of a suspect's guilt provides no cause to search his residence," ' " a magistrate can reasonably infer from " 'the nature of the crimes and the items sought . . . that a suspect's residence is a logical place to look for specific incriminating items." ' " (*People v. Pressey* (2002) 102 Cal.App.4th 1178, 1183.) That opinion surveyed decisions in which California courts and most federal circuit courts had applied that general rule to hold that "evidence of drug dealing, by itself, can furnish probable cause to search the dealer's residence." (*Id.* at p. 1185.) Thomas cites no ensuing authority altering that conclusion.

Nor was the link between Thomas and the apartment as attenuated as the one held insufficient to supply probable cause in *People v. Hernandez* (1994) 30 Cal.App.4th 919, on which Thomas relies. The only connection in that case between a known drug dealer and the house where a warrant was served was that the dealer had twice parked near the house. (*Id.* at pp. 923–924.) Here, by contrast, the police relied not only on Thomas having repeatedly parked near the building, but also on an Accurint report listing the apartment as his address.

Thomas also contends that the warrant's anticipatory clause was "based on a tautological fallacy" because, if probable cause that Thomas still resided in or controlled the apartment depended on his having a key, then "no probable cause existed to stop, detain and search him for those keys." But there was no inconsistency in finding probable cause to search Thomas, based on evidence unrelated to his residence, and probable cause to believe that if he was found to have a key to the apartment once listed as his residence, he

probably still lived there. There was no logical fallacy in the magistrate's reasoning.

2. *Any Violation of Thomas's Rights Did Not Require Suppression of Evidence Found in the Apartment.*

Thomas contends that his motion to suppress was wrongly denied because the conduct by which police officers determined he had a key to the apartment involved an unlawful de facto arrest, denial of his *Miranda* rights, and psychological coercion in violation of the due process clause. However, the officers properly secured Thomas's keys from his person during a lawful detention and search. We need not determine whether the detention then became an unlawful arrest, whether *Miranda* warnings were required before asking Thomas whether one of the keys was to his apartment, or whether Thomas was coerced to respond. Even if there were a violation of Thomas's rights in any of those respects—which we do not hold—the violation would not require suppression of the evidence found in the apartment. The officers' lawful possession of the keys made their eventual discovery of the evidence in the apartment inevitable. Evidence seized in violation of the Constitution need not be excluded "if the prosecution can establish by a preponderance of the evidence that the information would inevitably have been discovered by lawful means." (*People v. Carpenter* (1999) 21 Cal.4th 1016, 1040, citing *Nix v. Williams* (1984) 467 U.S. 431, 444; see also *People v. Superior Court (Walker)* (2006) 143 Cal.App.4th 1183, 1214–1215.) "As this is essentially a question of fact, we must uphold the trial court's determination if supported by substantial evidence." (*People v. Carpenter*, *supra*, at p. 1040.)

The warrant here authorized officers to search Thomas for, among other things, "keys in his possession . . . that will unlock the door to [the apartment]." Thomas does not dispute the lawfulness of the stop of his van or the search of his person, resulting in the discovery of three sets of keys in his

11

pants pocket. As the trial court reasoned, once the police had the keys, they could have taken them to the apartment and tried each one until they found the key that fit, which would have given them authority to search the apartment. (See *People v. Fayed* (2020) 9 Cal.5th 147, 183–184 [inevitable discovery doctrine " ' "is in reality an extrapolation from the independent source doctrine: *Since* the tainted evidence would be admissible if in fact discovered through an independent source, it should be admissible if it inevitably would have been discovered" ' "].)

Thomas contests that analysis, relying on *United States v. Dixon* (9th Cir. 2020) 984 F.3d 814. In *Dixon*, the Ninth Circuit Court of Appeals applied the rationale of *United States v. Jones* (2012) 565 U.S. 400, which held that any conduct that would have constituted a trespass at common law amounts to a "search" that must be justified under the Fourth Amendment. (*Dixon*, *supra*, at pp. 819–820, discussing *Jones*, *supra*, at pp. 406–410.) *Dixon* holds that inserting a key in the lock of a vehicle to determine if a person who dropped the key controls the vehicle constitutes a search that must be constitutionally justified. (*Dixon*, *supra*, at pp. 807–808.) Thomas contends that, had the officers taken his keys and tried each key in the apartment's lock until they ascertained whether one of them fit, that conduct would have constituted a series of unconstitutional searches. However, unlike the police officer in *Dixon*, the officers here had a warrant authorizing a search if they found Thomas in possession of a key to the property to be searched. Even if inserting each of Thomas's keys into the lock to ascertain if one fit were to be considered a "search," the warrant implicitly authorized that search. That is the only reasonable way to read the warrant.[4]

---

[4] The Attorney General does not cite *People v. Robinson* (2012) 208 Cal.App.4th 232, in which our colleagues in Division Five addressed

Moreover, even if each hypothetical attempt to insert the wrong key in the door lock were considered an illegal search, such a "search" would have yielded no contraband. The only search that produced the evidence Thomas sought to suppress was the search of the apartment authorized by the search warrant. There would have been no justification for suppressing the fruit of the lawful search even if prior searches were not authorized.

Thus, we conclude that the trial court properly refused to suppress the evidence seized in Thomas's apartment in the proper exercise of the authority conferred by the search warrant.

---

whether police officers conducted a "search" for Fourth Amendment purposes by inserting a key in the lock to an apartment door, thereby learning that a suspect who recently abandoned the key had access to that apartment. (*Id.* at pp. 236, 238–239, 243–245.) *Robinson* held that it is "a close question" whether, at common law, inserting a key into a publicly accessible lock, such as one on the front door of a dwelling, would constitute a trespass. (*Id.* at pp. 243–245; cf. *United States v. Bain* (1st Cir. 2017) 874 F.3d 1, 15–16 [inserting key in front door of apartment to determine if key fits constitutes a search]).) The *Robinson* court concluded that it need not decide whether inserting the key amounted to a warrantless search because, if so, the search was justified on the facts of *Robinson* under a "minimally intrusive search" exception to the Fourth Amendment's warrant requirement. (*Id.* at pp. 246–255.) In support of such an exception, the *Robinson* opinion cites, among other authorities, *Illinois v. McArthur* (2001) 531 U.S. 326, 330 ["When faced with special law enforcement needs, diminished expectations of privacy, *minimal intrusions*, or the like, the [United States Supreme] Court has found that certain general, or individual, circumstances may render a warrantless search or seizure reasonable"] (italics added), and *United States v. Concepcion* (7th Cir. 1991) 942 F.2d 1170, 1172–1173 [inserting key in lock to determine if holder of key resided in apartment constituted a "search," but intrusion was sufficiently minimal to make warrant unnecessary]. Here, even assuming that inserting Thomas's keys in the lock would have constituted a series of searches, and even if the warrant did not authorize those searches, *Robinson*'s "minimally intrusive search" exception to the warrant requirement might well have applied.

## Disposition

The judgment is affirmed.

POLLAK, P. J.

WE CONCUR:

BROWN, J.
NADLER, J.[*]

---

[*] Judge of the Sonoma County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.